# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

COMMONWEALTH *vs.* YODERNY PENA.[1]

Suffolk. March 6, 2009. - September 24, 2009.

Present: MARSHALL, C.J., IRELAND, COWIN, CORDY, & GANTS, JJ.

*Jury and Jurors. Practice, Criminal,* Empanelment of jury, Voir dire, Mistrial, Confrontation of witnesses, Instructions to jury, Argument by counsel, Argument by prosecutor, New trial, Assistance of counsel, Judicial discretion, Capital case. *Evidence,* Photograph, Relevancy and materiality, Cumulative evidence, Expert opinion, Unavailable witness, Business record, Medical record. *Constitutional Law,* Confrontation of witnesses, Assistance of counsel. *Mental Impairment. Homicide.*

At a murder trial, the judge neither abused his discretion nor erred in denying the defendant's motion for mistrial, or in declining the defendant's request

---

[1]An indictment was returned in this case on May 27, 2004, in the name of Francisco Cruz-Castro, an apparent alias of the defendant, Yoderny Pena. On August 27, 2004, the Commonwealth moved to amend the indictment to read "Yoderny Pena." See G. L. c. 277, § 19.

to conduct a further voir dire of empanelled jurors, where the defendant did not show that the jurors were exposed to extraneous information while they were not sequestered during a break that was taken in the empanelment proceedings. [9-12]

At the trial of an indictment charging murder in the first degree, the judge did not abuse his discretion in admitting two autopsy photographs, where the photographs showed wounds not depicted in other photographs, were plainly relevant to the issue of extreme atrocity or cruelty, and assisted the jury in understanding the medical examiner's testimony, and where the judge gave a limiting instruction. [12-13]

At a murder trial, the judge did not err in permitting a medical examiner to give testimony that relied on a report prepared by another medical examiner who was unavailable to testify [13-14]; nor did the medical examiner's testimony as to his own expert opinion violate the defendant's right to confrontation [15]; however, to the extent that the medical examiner testified about specific findings made by another medical examiner who was unavailable, any erroneously admitted findings were harmless beyond a reasonable doubt, where the manner and cause of death were not at issue in the trial, and any findings admitted in error were either not relevant to, or were used by the defense to illustrate, the contested issue of the defendant's mental impairment [15].

At a murder trial, the judge properly struck, sua sponte, a portion of the defense counsel's closing argument, where counsel made, in essence, a missing witness argument without having first sought the judge's permission or requesting a missing witness instruction. [15-17]

At a murder trial, the judge did not err in denying the defendant's motion for a mistrial on the basis that the prosecutor commented in his closing argument on the defendant's failure to testify, where, viewing the prosecutor's argument as a whole, and its relationship to the evidence admitted at trial and the arguments made by defense counsel, the comment could not be understood as a reference to the defendant's failure to testify, and it was not likely that the jury would have considered it as such [17-19]; however, even if the comment was reasonably susceptible to interpretation as a reference to the defendant's not having taken the stand, the judge's instructions were sufficient to negate any possible prejudice [19-20].

A trial court judge did not err in denying the criminal defendant's motion for a new trial, in which the defendant claimed that trial counsel had rendered ineffective assistance by not offering in evidence certain hospital records, and by not objecting to the striking of an expert witness's testimony that related to the hospital records, where the records were cumulative of other testimony given by the expert, and where trial counsel's strategic decision not to offer the records was not manifestly unreasonable, because the records included potentially damaging information. [20-23]

INDICTMENT found and returned in the Superior Court Department on May 27, 2004.

The case was tried before *Frank M. Gaziano*, J., and a motion for a new trial, filed on November 2, 2007, was considered by him.

*Stephen Neyman* for the defendant.

*Helle Sachse*, Assistant District Attorney, for the Commonwealth.

CORDY, J. On the afternoon of March 8, 2004, the victim was found stabbed to death in the bathtub of her apartment. Her boy friend, Yoderny Pena, was indicted for her murder. See note 1, *supra*. After a five-day jury trial, during which Pena claimed mental impairment, Pena was found guilty of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty. Represented by new counsel, Pena filed a motion for a new trial alleging ineffective assistance of counsel, which was denied. He appealed from the denial of the motion for a new trial, which was consolidated with his direct appeal.

Pena argues on appeal that he is entitled to a new trial because (1) seated jurors were permitted to mingle with the rest of the venire during a short break from the empanelment proceedings; (2) the inflammatory quality of two particular autopsy photographs outweighed their probative value; (3) the testimony of a medical examiner who neither performed nor attended the victim's autopsy violated Pena's right to confrontation and Massachusetts evidence law; (4) the judge improperly struck a portion of defense counsel's closing argument; (5) the prosecutor improperly commented on Pena's failure to testify during closing argument; and (6) trial counsel was ineffective for failing adequately to make a record and object to the judge's striking of a portion of Pena's psychiatric expert's testimony. We affirm the conviction and decline to grant relief under G. L. c. 278, § 33E.

1. *Trial.* The jury could have found the following facts. In March, 2004, the victim was living with her younger brothers and her three children in the second-floor apartment at 43 Wilcock Street in the Mattapan section of Boston. Her boy friend, Pena, had also been living there for the previous month or two. At approximately 11:45 A.M. on March 8, 2004, the victim and her friend Maria Mercedes arrived at Mercedes's home in the Roslindale section of Boston after working out together at a gym. The victim stayed very briefly at Mercedes's residence, and then left to go home and shower to prepare for an appointment that she had at approximately 1:30 P.M.

Amika Williams, the victim's downstairs neighbor, returned home from her job at approximately 11:30 A.M. that morning.

Williams parked her vehicle at 43 Wilcock Street behind Pena's green Ford Taurus automobile. Some time after Williams entered her first-floor apartment, she heard arguing from the second-floor apartment. She heard voices, followed by crying, and then silence. Williams dozed off in her bedroom for a while, and when she arose at approximately 1:30 P.M. to check her mailbox she saw the victim's brother, Stephen, returning home from school.

As Stephen approached 43 Wilcock Street, he observed the victim's and Pena's cars parked on the street. Pena was standing on the porch of 43 Wilcock Street. When Pena noticed Stephen, he covered his face with the collar of his jacket, slouched down, ran to his car, and drove off. Stephen then entered the second-floor apartment and found the victim, unresponsive, lying naked and pale in the bathroom. There was blood on the bathroom walls and floor. Stephen dialed 911.[2]

Lieutenant Gilbert Quinchia of the Boston fire department responded to the scene shortly after 1:30 P.M. He observed the victim's naked body laying face-up in a pool of blood in the bathtub. She had several stab wounds about her neck and chest. Lieutenant Quinchia further observed blood spatter about the walls and neatly folded clothes on the seat of the toilet.

Dr. Marie Cannon from the medical examiner's office conducted an autopsy on the body on March 12, 2004, and prepared an autopsy report shortly thereafter. Dr. Cannon was on leave from the medical examiner's office at the time of trial, so the chief medical examiner, Dr. Mark Flomenbaum, testified. Dr. Flomenbaum reviewed the file maintained by the medical examiner's office regarding the victim's death. The file contained the autopsy report, laboratory reports, photographs, and additional information. Based on his review of the file, Dr. Flomenbaum opined that the victim died as a result of multiple cut and stab wounds,[3] fifty-one in all, causing her to "bleed[] out." Seven or

---

[2]When Stephen first attempted to dial 911, he noticed the telephone had been unplugged. After plugging the telephone back into the telephone jack, he was able to complete the call.

[3]Dr. Flomenbaum described a "cut" as an incision wound caused by an object that is longer on the body than it is deep. A "stab wound," on the other hand, is caused when a sharp object penetrates the body deeper than it is long on the surface.

eight of the stab wounds also could have been independently fatal.

Dr. Flomenbaum testified that most of the fatal injuries were located in the chest area, penetrating the lungs. Two stab wounds entered through the chest and through the diaphragm, one further entering the victim's stomach. The injuries to her lungs would have caused bleeding and would have compromised her ability to breathe. The victim also received two injuries to her neck: a superficial one and one cut through her trachea, which exposed the airway to the outside. Dr. Flomenbaum opined that the cut through the victim's airway itself would have only minimally affected her ability to breathe, but blood could have flowed into her lungs because the cut extended into the blood vessels. More importantly, the cut extended into the nerves that control the mechanism that switches from the air to the food tube, thereby significantly compromising the victim's ability to breathe, and her ability to speak or scream would have been reduced to what might have been a deep gurgling sound.

Looking at autopsy photographs, Dr. Flomenbaum testified that many of the stab wounds showed great variability in direction, depth of penetration, and orientation of the knife, indicating that the knife was pointed and held in different directions while the injuries were inflicted. Dr. Flomenbaum opined that the variability of the victim's injuries implied that there was a lot of relative movement between the victim and the knife, and that a large amount of time passed between the injuries. On cross-examination, Dr. Flomenbaum estimated that it would have taken somewhere between two and ten minutes to inflict all of the injuries. Some injuries suggested that the victim tried to deflect the knife, thus indicating that she was conscious through a large portion of the injuries, possibly all of them.

Police officers found red stains consistent with human palm prints on the bathroom door and the windowsill above the bathtub, and several (bare) footprints on the floor tiles. John Black of the South Carolina State law enforcement division crime laboratory[4] compared the two latent palm prints and two latent footprints with known prints from Pena and concluded that the latent prints matched Pena's.

---

[4]John Black's work on the investigation into the victim's death was performed pursuant to a contract with the Boston police department.

Several of the victim's family members and her neighbor Williams testified that they never saw Pena intoxicated or using drugs while he was living with the victim. The police observed no signs of cocaine use or empty alcohol containers during the search of the apartment, and did not find any evidence of cocaine in Pena's green Ford Taurus or in Pena's other car that the police searched.

Pena did not testify at trial. Pena's defense counsel acknowledged that Pena had killed the victim, and the defense proceeded under the theory that Pena had done so while mentally impaired and unable to form the mental state required for murder in the first degree. The only witness called by the defense was Dr. Rebecca Brendel, a psychiatrist from Massachusetts General Hospital, who testified to her opinion of Pena's mental status on the day of the victim's death. Dr. Brendel reviewed Pena's medical records reaching back to 1996, when Pena first sought psychiatric treatment in the Dominican Republic, as well as records from the Boston Medical Center, Holy Family Hospital, and Bridgewater State Hospital, dating after 2002 when Pena moved to the United States. Dr. Brendel also reviewed reports prepared by a Dr. Presskreischer, a psychologist retained in this case to gather Pena's mental health history, and by the Commonwealth's expert, a Dr. Fife.[5] Finally, Dr. Brendel spoke to Pena's sister and interviewed Pena while he was incarcerated.

According to Dr. Brendel, Pena's history of mental illness began when he was eighteen years old, and included changes in his mood; periods of severe and profound depression and agitation; a clearly documented history of psychotic symptoms, affecting his ability to think clearly and appreciate reality; paranoia, suicidal thoughts, and fears that others might harm him; and a documented history of long-term substance abuse. The onset of Pena's psychiatric symptoms coincided with the beginning of his drug abuse.

Beginning in 1996 Pena sought psychiatric help in the Dominican Republic, where he was treated for symptoms of severe depression and psychosis, and was diagnosed with bipolar disorder with psychotic features. One of Pena's doctors in the

[5]Neither Dr. Presskreischer nor Dr. Fife testified at trial.

Dominican Republic noted that at certain times Pena's course was characterized by alcohol and drug use. Dr. Presskreischer's report, prepared after the murder, also reflected that Pena's doctors in the Dominican Republic indicated that Pena was psychotic, experienced hallucinations, and thought he was being watched, pursued, and persecuted. Pena himself told Dr. Brendel that he attempted suicide three times in the Dominican Republic. Further, a note from the Suffolk County sheriff's department indicated that Pena had attempted suicide while incarcerated in October, 2004. In June, 1999, Pena was hospitalized in the Dominican Republic and treated with electroconvulsive therapy and antipsychotic medications. A second doctor who treated Pena in the Dominican Republic believed that Pena was severely mentally ill. This doctor continued to prescribe medications to treat Pena's mental illness until December, 2003, after Pena had moved to the United States in 2002.

Dr. Brendel testified that Pena told her that he continued to use drugs after he came to the United States. She explained that alcohol is a potent depressant and that individuals suffering from depression commonly become more depressed when they are abusing alcohol. Likewise, Dr. Brendel explained, cocaine can cause people with symptoms like Pena's to become sad and more paranoid and may affect memory and sleep.[6]

Dr. Brendel testified further that in the spring of 2003 (one year before the murder), Pena was evaluated by a psychiatrist at Boston Medical Center, who diagnosed him with recurrent major depression and prescribed several medications to treat depression and acute symptoms of anxiety. At his sister's urging, Pena also saw a social worker at Boston Medical Center on March 3, 2004, only five days before the murder. The social worker was unable to evaluate Pena fully because no interpreter was available, but noted that Pena was suffering from depressive symptoms and had poor memory and concentration, and that his symptoms required further evaluation. Pena's sister told Dr. Brendel that Pena went into a depressive state several months before the

[6]On cross-examination, Dr. Brendel recalled that a report prepared by the Commonwealth's expert, Dr. Fife, indicated that six months before the murder Pena had reported using less alcohol and experiencing better moods and fewer sleep problems.

murder, and that he had been acting strangely in the weeks before the murder. She specifically recalled one incident when Pena told her that he thought people were following him and later seemed disoriented. Dr. Brendel explained to the jury that people suffering from mental illness, like Pena, will typically experience mood swings and will vary between periods of acute mental illness and periods without any symptoms at all.

Pena told Dr. Brendel that on the day of the murder he was severely depressed, extremely agitated; and acutely suicidal; that he had not slept for three nights; and that he had been using cocaine, marijuana, and alcohol.[7] On the morning of the murder he went to the second-floor apartment of 43 Wilcock Street with the intention of jumping from the apartment to kill himself, and that he had gone to the kitchen to get a knife to kill himself. Pena could not explain to Dr. Brendel why he had not followed through with that plan, but he showed her scars that he reportedly inflicted on himself with a knife. Photographs of Pena's wounds were introduced in evidence and they depicted scars from several injuries to his neck, abdomen, and arm. Pena told Dr. Brendel that he had also hurt the victim that day, but he was unable to explain why he had done so. Pena claimed that his mind had gone blank, causing him to have very little memory of what had occurred, that he had a brief recollection of cutting himself and the victim, but that he never had any plans to hurt her, and only wanted to hurt himself. Pena said that he loved the victim very much and that if he had been thinking clearly that this day never could have happened. Pena reported still hoping that she was alive after the incident.

On the basis of all of this information, Dr. Brendel concluded that Pena suffered from a chronic and severe mental illness on the day of the killing; that Pena was suffering from depression and was preoccupied with suicidal thoughts; and that he had difficulty remembering what happened because of a combination of his mental illness and substance abuse. She further opined that the information she obtained from Pena cast doubt on whether he was capable of deliberating in a cool and reflective manner, and whether he was able to form a coherent plan to kill himself or his girl friend. Dr. Brendel expressed serious doubt whether

---

[7] Dr. Brendel, on cross-examination, conceded that no medical evidence corroborated whether Pena had been using drugs prior to the murder.

Pena could form the intent required for murder in the first degree on the day of the killing.

Dr. Brendel also testified that Pena's treatment for symptoms of mental illness continued after the killing. Five months after the murder, between August 3 and August 10, 2004, Pena was hospitalized at Holy Family Hospital. In addition, after he surrendered to the police on August 27, 2004, Pena was evaluated at Bridgewater State Hospital, where he remained until September 24, 2004. There Pena was found competent to stand trial, but was not evaluated as to his criminal responsibility. On cross-examination, Dr. Brendel admitted that the report from Bridgewater State Hospital also indicated a high suspicion that Pena was feigning memory problems.[8] She further admitted that there was no indication in the record that Pena experienced any symptoms of alcohol or drug abuse withdrawal while at Bridgewater State Hospital.

2. *Discussion.* a. *Jury empanelment.* During the jury empanelment process, after nine jurors had been seated,[9] the judge ordered a fifteen-minute mid-morning break. After the break, defense counsel moved for a mistrial because the seated jurors had been permitted to take their break together with the rest of the venire. The judge denied defense counsel's motion. Before the lunch break later that day, the judge instructed the seated jurors not to discuss the case among themselves or with others. After the lunch recess, defense counsel asked the judge to conduct a voir dire of the sitting jurors who were exposed to the rest of the venire to determine what they heard and from whom. The judge denied this request because there was "absolutely no evidence before [him] that they were exposed to extraneous information."

---

[8]On redirect examination, Dr. Brendel testified that the possibility that Pena was feigning memory problems was undercut by Pena's history of memory impairment, which preceded any criminal involvement. This history of memory impairment included Pena's visit to the social worker at Boston Medical Center on March 3, 2004. Dr. Brendel testified that the record from that visit indicated that Pena's memory was "quite impaired." Dr. Brendel believed this to be significant because the visit preceded the killing by five days and "show[ed] a consistent pattern from the time [Pena] was first in treatment in 1996 of a difficulty describing his symptoms and of thinking clearly during periods when he was acutely ill."

[9]The nine jurors seated at this point remained on the jury that heard Pena's case. Two of the nine jurors were alternates who did not participate in deliberations.

Pena argues that the judge's refusal to conduct a voir dire of the jurors after the motion for a mistrial requires reversal of his conviction because absent the voir dire there was no way to ascertain whether the seated jurors were exposed to extraneous influences. We disagree.

First, G. L. c. 234A, § 74, precludes Pena's claim. That statute provides in part: "Any irregularity in . . . impanelling . . . jurors . . . shall not be sufficient to cause a mistrial or to set aside a verdict unless objection to such irregularity or defect has been made as soon as possible after its discovery or after it should have been discovered *and* unless the objecting party has been *specially injured or prejudiced* thereby" (emphasis added). G. L. c. 234A, § 74. Although Pena made a timely objection, he failed to show (beyond speculation) how he was specially injured or prejudiced by the judge's failure to sequester the seated jurors from the venire. It was the very absence of evidence that the jurors were exposed to extraneous information that caused the judge to deny Pena's request to individually voir dire the seated jurors. See, e.g., *Commonwealth* v. *Cordle*, 412 Mass. 172, 180 (1992) ("burden is on the defendant to demonstrate that the [unsequestered] jurors were exposed to extraneous information and, in the absence of such evidence, the defendant's claim must fail"). Cf. *Commonwealth* v. *Dixon*, 395 Mass. 149, 151 (1985) ("No duty to investigate arises unless the court finds some suggestion or showing that extraneous matters were brought into the jury's deliberations"). The judge's ruling was proper.

Pena's reliance on G. L. c. 234, § 28, is unavailing. That statutory provision requires a judge to examine prospective jurors individually when "it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case . . . the juror may not stand indifferent."[10] G. L. c. 234, § 28. "If it appears that a juror might act in whole or in part on

[10]General Laws c. 234, § 28, provides in pertinent part:

"For the purpose of determining whether a juror stands indifferent in the case, if it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including, but not limited to, com-

issues extraneous to the case, the judge must conduct individual voir dire. . . . A judge has considerable discretion as to whether the circumstances present a substantial risk that an extraneous influence might affect jurors. . . . The defendant must show that there is some basis for finding that a substantial risk of extraneous influences on the jury exists . . . and that there is a substantial risk that jurors would be influenced by such considerations." (Citations omitted.) *Commonwealth* v. *Ashman*, 430 Mass. 736, 739 (2000). Here, the jurors whom Pena now challenges had already been seated after being subject to individual voir dire examinations. Pena does not claim any irregularity with this process. The judge was not required by G. L. c. 234, § 28, to conduct a second individual voir dire of the seated jurors in the absence of a showing of a substantial risk of extraneous influences, and did not abuse his discretion in denying Pena's request to do so.

The seated jurors had not yet heard any evidence in the case and had, just a short time before the morning break, acknowledged their ability to be impartial, to "listen to the evidence presented inside the courtroom," and to follow the judge's instructions. Immediately before the afternoon lunch recess the judge instructed the seated jurors not to discuss the case with anyone and admonished the jurors that they would ultimately be called on to "decide this case based upon the evidence that's presented inside this courtroom, not on any outside influences." The judge repeated similar instructions after the entire jury were empanelled and at the end of each day of trial. The judge also gave a similar instruction during his final jury charge. "The judge was entitled to assume that the jurors would heed his instructions." *Commonwealth* v. *Clark*, 432 Mass. 1, 10 (2000).

In sum, the judge did not abuse his discretion or commit any

munity attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall, or the parties or their attorneys may, with the permission and under the direction of the court, examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any other matters which may, as aforesaid, cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case. Such examination . . . shall be conducted individually and outside the presence of other persons about to be called as jurors or already called."

other error of law in denying Pena's motion for a mistrial or his request to conduct a further voir dire of the seated jurors.

b. *Autopsy photographs.* At a sidebar conference, the prosecutor identified six autopsy photographs that he intended to offer in evidence during Dr. Flomenbaum's testimony. Defense counsel objected to two of these photographs. One depicted the wounds to the left side of the victim's chest. The other showed the injuries to her neck and included a small ruler used to show the size of the wounds. Noting that the Commonwealth had already pared down its proposed photographic presentation by not offering other "closer-up photographs," the judge overruled defense counsel's objection because the photographs fairly depicted the nature and extent of the victim's injuries to her chest and neck. Pena argues that the admission of the photographs over his objection constitutes reversible error because the cause and manner of death were not contested and the photographs had no value to the Commonwealth other than to evoke unnecessary prejudice toward Pena.

"The question whether the inflammatory quality of a photograph outweighs its probative value and precludes its admission is determined in the sound discretion of the trial judge." *Commonwealth* v. *DeSouza*, 428 Mass. 667, 670 (1999), and cases cited. "The fact that a photograph is cumulative of other evidence has not required the exclusion of the photograph." *Id.*, and cases cited. "Even if a defendant agrees to stipulate to the facts that an offered photograph tends to prove, it is generally not error to admit it." *Id.* "A judge may appropriately attempt to mitigate the potentially prejudicial nature of a photograph by instructing the jury that the photograph is to be used in analyzing the evidence and is not designed to elicit sympathy." *Id.*, and cases cited.

The admission of the challenged photographs was well within the judge's discretion. The two challenged autopsy photographs showed wounds that were not depicted in any of the other autopsy photographs. See *Commonwealth* v. *Urrea*, 443 Mass. 530, 545 (2005) (no error in admitting eleven autopsy photographs where each photograph "depicted at least one wound that did not appear in any of the others"). These photographs were plainly relevant to the issue of extreme atrocity or cruelty and they

assisted the jury in understanding Dr. Flomenbaum's testimony.[11] See *Commonwealth* v. *Boateng*, 438 Mass. 498, 507 (2003), citing *Commonwealth* v. *Obershaw*, 435 Mass. 794, 803 (2002) (autopsy photographs relevant to show extreme atrocity or cruelty); *Commonwealth* v. *Todd*, 394 Mass. 791, 796 (1985) ("although the medical examiner testified as to the mechanisms of death, oral testimony describing the victim's injuries may be supplemented with photographs"). Moreover, the judge instructed the jury during Dr. Flomenbaum's testimony and again during the final jury charge that the purpose of the photographs was to determine the nature and extent of the victim's injuries and not to arouse sympathy, passion, or prejudice. See *Commonwealth* v. *Allison*, 434 Mass. 670, 684-685 n.11 (2001) (judge should instruct jury that photograph not designed to elicit sympathy but to be used in analyzing evidence).[12]

c. *Dr. Flomenbaum's testimony.* Near the beginning of Dr. Flomenbaum's testimony, defense counsel objected to the testimony on the ground that Dr. Flomenbaum was not the medical examiner who had performed the autopsy. The judge overruled defense counsel's objection, indicating that he would allow Dr. Flomenbaum to testify to his opinion of the manner and cause of the victim's death based on the information in Dr. Cannon's autopsy report.[13] Defense counsel objected again when the prosecutor asked Dr. Flomenbaum for his opinion as to the cause of death and when Dr. Flomenbaum began describing the victim's wounds as depicted in the autopsy photographs and

[11]While photographs of this type are always distressing, the photographs objected to were not unusually gruesome or inflammatory.

[12]Pena's reliance on *Commonwealth* v. *Richmond*, 371 Mass. 563 (1976), to support his argument for reversal is misplaced. There, the court reversed the defendant's conviction where the jury were permitted to view photographs of the deceased victim that showed extensive facial injuries caused by postmortem dog bites that occurred after the victim's body was left in a snow bank. *Id.* at 563-564, 566. The court concluded that "the evidential value of the photographs . . . was overwhelmed by the prejudicial effect." *Id.* at 565. Unlike the *Richmond* photographs, the autopsy photographs here depicted several of the injuries that caused the victim's death. There were no irrelevant and prejudicial postmortem injuries depicted in the autopsy photographs in this case.

[13]The Commonwealth also moved to admit the autopsy report in evidence as a business record, "subject to any redaction [the judge thinks] is appropriate." The judge ruled that the autopsy report was not admissible as a business record insofar as it had been "created in anticipation of litigation."

report. The judge overruled both objections. The judge later sustained defense counsel's objection to Dr. Flomenbaum's reading directly from Dr. Cannon's autopsy report, but indicated that the prosecutor could refresh Dr. Flomenbaum's recollection, if necessary, using the autopsy report.

Pena argues that the judge committed reversible error by permitting Dr. Flomenbaum to testify and offer his opinions because his testimony was based solely on inadmissible evidence. Pena also argues that this testimony violated his right to confrontation, see *Crawford* v. *Washington*, 541 U.S. 36, 53-54 (2004) (*Crawford*) (confrontation clause prohibits admission of testimonial out-of-court statements unless declarant unavailable and defendant had prior opportunity to cross-examine declarant about statements), and the Massachusetts law of evidence, see *Commonwealth* v. *Markvart*, 437 Mass. 331, 338 (2002) ("expert's direct examination may not be used to put before the jury facts that are not [and will not be] properly in evidence").

Pena relies on *Commonwealth* v. *Goudreau*, 422 Mass. 731 (1996), to argue that Dr. Flomenbaum's testimony in reliance on a report prepared by someone else was improper under Massachusetts law. In that case, the court upheld a ruling of the trial judge excluding the testimony of two expert witnesses about the contents of specific records, in the absence of any showing that the records were themselves admissible. *Id.* at 734-735. This holding does not preclude an expert from basing his opinion on facts or data not in evidence that are independently admissible and are a permissible basis for an expert to consider in formulating such an opinion. *Commonwealth* v. *Markvart, supra* at 337.

We have recently held that a testifying medical examiner may rely on an autopsy report prepared by another medical examiner for this very reason. See *Commonwealth* v. *Nardi*, 452 Mass. 379, 389 (2008). See also *United States* v. *De La Cruz*, 514 F.3d 121, 134 & n.5 (1st Cir. 2008), quoting *Crowe* v. *Marchand*, 506 F.3d 13, 17-18 (1st Cir. 2007) (expert reliance on reports prepared by another medical examiner "plainly justified in light of the custom and practice of the medical profession"). Thus, contrary to Pena's contention, Dr. Flomenbaum was not foreclosed from forming and testifying to an opinion based on Dr. Cannon's autopsy report.

As it relates to Dr. Flomenbaum's own expert opinions, Pena's argument that his right to confrontation was violated is also foreclosed by our holding in *Commonwealth* v. *Nardi, supra* at 388-391 (right of confrontation not violated where medical examiner who did not perform autopsy testified to his own opinion as to cause of death). To the extent that Pena's objection is to Dr. Flomenbaum's direct testimony about some of the specific findings in the autopsy report (made by Dr. Cannon), and such testimony may not have been admissible at that point in the trial, see *id.*, any such error was harmless beyond a reasonable doubt in the circumstances of this case. The manner and cause of death were not contested issues in the trial. Any erroneously admitted findings were either irrelevant to the only contested issue, Pena's mental impairment, or were affirmatively used by defense counsel to illustrate that impairment. For example, during his opening statement, defense counsel told the jury: "We don't contest that Mr. Pena is responsible for this terrible, terrible incident, where this woman was stabbed some fifty-one times. No one but a crazy man would do this. He was suffering from a severe mental illness." Then, during closing, defense counsel argued:

> "In my opening . . . I told you you'd see evidence, that only a crazy person could stab his girlfriend, whom he loved, fifty-three times, seven stabs that could have independently caused death. Any one of them could have caused death. Why the seven unless someone was out of control, not rational, didn't know what he was doing? And what about the other cuts, in all different fashions on different parts of the body, all irrational."

d. *Judge's sua sponte striking of portion of defense counsel's closing argument.* During his closing, defense counsel commented on the Commonwealth's failure to call an expert witness to rebut Dr. Brendel's testimony:

> "[The prosecutor] didn't even bring in his expert. You heard that he had an expert.[14] Where is that expert? We're only left with our expert. We can only conclude that if that

---

[14]The jury learned that the Commonwealth had retained Dr. Fife as an expert during the Commonwealth's cross-examination of Dr. Brendel.

expert had come in he couldn't have rebutted our expert's testimony. So, think about that. No expert. All [of the prosecutor's] evidence dealing with irrelevant issues."

After defense counsel's closing the judge instructed the jury, sua sponte:

> "Members of the jury, [defense counsel] argued that the Commonwealth's expert couldn't rebut the defense expert, that's why you didn't hear from the Commonwealth's expert. As I told you, you can only consider the evidence that's properly introduced during the course of the trial. You are not allowed to speculate as to evidence you did not hear during the course of the trial. For that reason I ask you to strike that portion of the defense's closing arguments."

Defense counsel then argued at sidebar that he had the right to discuss the Commonwealth's failure to call Dr. Fife because she was available to be called and the Commonwealth offered no explanation for its failure to call her. The judge disagreed and concluded that the argument was improper because defense counsel had asked the jury to speculate. Pena now argues that the judge's sua sponte instruction and striking of a portion of defense counsel's closing argument were inappropriate. He analogizes the situation to cases in which a defendant offers an alibi and the Commonwealth is permitted to comment on his failure to call witnesses to corroborate the defense. See, e.g., *Commonwealth* v. *Olszewski,* 416 Mass. 707, 722-725 (1993). Pena argues that defense counsel's comment was warranted and the judge's response communicated to the jury his approval of the Commonwealth's decision not to call Dr. Fife. In arguing for reversal, Pena emphasizes the fact that the judge's response "went to the heart" of Pena's case: the Commonwealth's failure to overcome his mental impairment defense with proof beyond a reasonable doubt.

The judge's instruction and subsequent ruling at sidebar were proper. Defense counsel essentially made a missing witness argument without first seeking the judge's permission or requesting a missing witness instruction. See *Commonwealth* v. *Saletino,* 449 Mass. 657, 670 (2007) ("before giving [a missing wit-

ness] instruction, and before permitting counsel to argue the point, the judge must be satisfied that the foundational requirements for the instruction and argument are in fact met and that the adverse inference is warranted in the circumstances").[15] While a defendant may "legitimately point out that a specific witness or specific evidence has not been produced," *id.* at 672, and argue that the Commonwealth has thus not proved its case beyond a reasonable doubt, a defendant may not argue in a case where there is no missing witness instruction that the jury should infer from the Commonwealth's failure to call a witness that the witness would have been unable to rebut a defense witness. See *id.* at 672 n.23 (argument in which defense counsel "implie[s] that [missing witness's] testimony would have been unfavorable to the Commonwealth" is a "classic missing witness argument"). "It is a powerful accusation — that a party is withholding evidence that would be unfavorable — and that is why we regulate it closely and require judges to assess very carefully whether to give the instruction and to permit the argument in a given case." *Id.* at 673. Because defense counsel did not request or secure the judge's permission to make a missing witness argument after establishing its foundational requirements, defense counsel's comment called for the jury to speculate impermissibly as to the content of potential testimony not in evidence. See *id.* at 672 n.22 (generally, jury "not to draw any conclusion about the content of evidence that was not produced"). The judge's instruction and subsequent ruling were entirely proper.

   e. *Prosecutor's comment during closing argument.* In his closing, defense counsel argued that, in order for someone to act rationally, there must be a motive. He then pointed out that

---

[15] "A missing witness instruction is appropriate [and a missing witness argument permissible] when a party 'has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case,' and the party, without explanation, fails to call the person as a witness." *Commonwealth* v. *Saletino*, 449 Mass. 857, 667 (2007), quoting *Commonwealth* v. *Anderson*, 411 Mass. 279, 280 n.1 (1991). "Such an instruction should not be given where the Commonwealth has legitimate tactical reasons for not calling the witness." *Commonwealth* v. *Saletino, supra* at 668. Even if the foundational requirements are met, a judge may decline to give the instruction or refuse to permit the argument if he finds, in the exercise of his discretion, that an adverse inference is not warranted.

the Commonwealth had produced no evidence of a motive: No evidence of why Pena stabbed to death someone he loved. Consequently, there was "no evidence of any rationality" on Pena's part, and the Commonwealth had thus failed to disprove mental impairment.

In apparent response to this argument, the prosecutor made the following statement in his closing argument:

> "[W]hat have we learned that says mental illness or mental impairment had anything to do with this? "Well, we don't know why. We don't [know] why he did it . . . .
>
> "Two people are close to each other, they have an argument and one of them ends up dead. Well, one of them will never be able to tell us why it happened, will she? [The victim], obviously, can never tell us. The defendant is the only one who knows why he did it. He's the only one who knows why he got so enraged that he had to kill . . . ."

At this point, defense counsel's objection to the prosecutor's argument was sustained. Immediately after the prosecutor's closing, the judge informed the jury:

> "[C]ounsel stated that the defendant is the only one who knows; he made a reference in that regard. The defendant, as I will instruct you later, has an absolute right not to testify in this case, and it is improper to comment on that right to remain silent. You are to disregard that portion of the prosecutor's closing argument."

A sidebar conference followed, during which defense counsel moved for a mistrial as a result of the prosecutor's comment on Pena's failure to testify. Defense counsel argued that this was the type of error that could not be corrected by a curative instruction. The judge denied defense counsel's motion for a mistrial. The judge further instructed the jury in detail during the final jury charge about Pena's absolute right not to testify, explained that the jury must not draw any adverse inference from his failure to testify, and admonished the jury not to discuss or consider it in any way.

Pena argues on appeal that the judge's refusal to grant a

mistrial is reversible error. In the Commonwealth's view, the prosecutor did not comment on Pena's failure to testify, but was properly commenting on the evidence adduced at trial. That evidence included testimony elicited by defense counsel from Dr. Brendel, with respect to Pena's mental state, that Pena did not explain to her why he stabbed his girl friend, except to say that he did not intend to and that his mind went blank and he had very little memory of what occurred other than cutting her and himself. The Commonwealth argues further that the judge's striking of the prosecutor's comment and immediate jury instruction, though unnecessary, cured any potential prejudice resulting from the prosecutor's comment.

Whatever the prosecutor's intent, if his remarks were reasonably susceptible of being interpreted as a comment on the defendant's failure to take the stand, they would be improper. See *Commonwealth* v. *Gouveia*, 371 Mass. 566, 571 (1976). The question whether the prosecutor's remarks were susceptible of being so interpreted is a close one in this case. Reviewing the prosecutor's argument as a whole, and its relationship to the evidence admitted at trial and the arguments made by defense counsel, we are persuaded that the prosecutor did not intend his comment to be understood as a comment on Pena's failure to testify, and that it is not likely that the jury would have considered it as such.[16]

However, even if we were to conclude that the remarks were

---

[16]The prosecutor's remarks may be characterized more as a comment on the absence of evidence of motive as opposed to Pena's failure to take the stand. The prosecutor essentially argued that the absence of evidence of Pena's motive should not lead the jury to conclude that Pena must have been mentally ill to have killed the victim. The thrust of his argument was not so much that Pena did not testify, but that the Commonwealth's inability to prove Pena's motive should not cause the jury to conclude that Pena must have been mentally ill. After defense counsel's objection was sustained, the prosecutor continued his argument as follows:

"There are some things, ladies and gentlemen, that aren't knowable. Why this happened is one of those things. We know certain things happen that are horrible, they're horrible crimes, and we never know why they happened. That doesn't mean they're a product of mental illness. That doesn't mean they're a product of mental impairment. There's nothing about what happened, from the evidence, that suggests that this happened as a result of that except, the words of Dr. Brendel, her testimony. And I'm asking you to discount and discredit that testimony."

reasonably susceptible of being interpreted as a comment on
Pena's failure to take the stand, "it does not necessarily follow
that there was error in a denial of a mistrial by the judge." K.B.
Smith, Criminal Practice and Procedure § 35.28, at 839 (3d ed.
2007). The "[d]enial of a mistrial and reliance on curative
instructions may be proper, in the judge's discretion, even in a
case of clearly improper argument by a prosecutor." *Common-
wealth* v. *Gouveia, supra* at 572. See *Commonwealth* v. *Small-
wood*, 379 Mass. 878, 891-893 (1980) (no abuse of discretion
in judge's denying mistrial and relying on instructions to preclude
potential prejudice where "the improper implication was not
even particularly clear"). The judge's prompt and thorough
instructions here "were sufficiently clear and complete to negate
any possible prejudice to the defendant." *Commonwealth* v.
*Phoenix*, 409 Mass. 408, 427 (1991), quoting *Commonwealth* v.
*Ferreira*, 381 Mass. 306, 316 (1980). There was no error.[17]

f. *Denial of new trial motion based on ineffective assistance
of counsel.* Near the end of Dr. Brendel's direct examination,
she testified that she had reviewed records from Pena's hospital-
ization at Holy Family Hospital between August 3 and August
10, 2004. Dr. Brendel explained that those records were relevant
to her because they indicated an evaluation of Pena that oc-
curred outside the criminal context close in time to the Bridge-
water State Hospital evaluation. Defense counsel asked whether
those records contained anything relevant to Dr. Brendel's
opinion and she answered:

> "Well, in those records there was some concern about Mr.
> Pena's difficulty with memory and being able to give an

---

[17]We are not persuaded that *Commonwealth* v. *Mahdi*, 388 Mass. 679
(1983), on which Pena principally relies, counsels for reversal. In the *Mahdi*
case, the defendant was convicted of murder in the first degree after a trial at
which it was undisputed that he had committed the homicide. *Id.* at 680, 684.
Mahdi's defense was that he lacked the mental capacity to appreciate the
criminality or wrongfulness of his conduct or to conform his conduct to the
requirements of law. *Id.* at 684. During closing argument, the prosecutor com-
mented on Mahdi's choice to remain silent after being arrested and advised of
his Miranda rights. *Id.* at 694. The purpose of the prosecutor's argument was
to suggest that the jury should infer from Mahdi's postarrest, post-Miranda
silence that Mahdi was in fact sane. See *id.* at 695. That is simply not this
case.

accurate history. The discharge diagnosis included a diagnosis of psychosis not otherwise specified. So, the physicians in the hospital did observe him at some time during the hospitalization to be suffering from psychotic symptoms."

The prosecutor then objected and argued at sidebar that the Holy Family Hospital records had not been provided to the Commonwealth's expert or the court. The prosecutor asked either to see the records or have the answer struck. Defense counsel responded that she believed she had produced all the records in her possession, and if not, this was done inadvertently. Defense counsel then added, "And I don't have any more questions about these records." The judge then excluded and struck Dr. Brendel's answer excerpted above. Defense counsel did not object.

Represented by new counsel, Pena filed a motion for a new trial in November, 2007, contending he was denied the effective assistance of counsel because his trial counsel failed adequately to make a record and object to the judge's striking of Dr. Brendel's testimony. In support of his motion, Pena submitted the medical records from his hospitalization at Holy Family Hospital. On July 14, 2008, the same judge who presided over the trial denied the motion, reasoning that given Dr. Brendel's "extensive testimony," "trial counsel's failure to object to the exclusion of a small portion of the defendant's mental health records did no real harm to the overall defense of the case," and was therefore not ineffective.

On appeal Pena essentially argues that the records should have been offered (and admitted) in evidence because they contradicted the Commonwealth's contention that Pena was feigning memory problems.[18] Had they been admitted, Pena further argues, it is likely that the jury would have appreciated and believed that Pena's mental illness was a "true defense" to his case. Therefore, the judge's denial of his new trial motion constitutes reversible error. We disagree.

---

[18]Pena's claim of ineffectiveness is not thus limited to counsel's apparent failure to provide copies of the records to the Commonwealth, the resulting striking of a single answer at the end of Dr. Brendel's testimony, or the failure to object to the judge's ruling.

Because Pena was convicted of murder in the first degree, we consider his claims of ineffective assistance of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, pursuant to G. L. c. 278, § 33E, which is more favorable to the defendant than the constitutional standard for ineffective assistance. *Commonwealth* v. *Williams*, 453 Mass. 203, 204 (2009). "Thus, we consider whether there was error during the course of the trial, and, if so, whether the error was 'likely to have influenced the jury's conclusion.' " *Id.* at 205, quoting *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). "Under this more favorable standard of review, we consider a defendant's claim even if the action by trial counsel does not 'constitute conduct falling "measurably below" that of an "ordinary fallible lawyer." ' " *Commonwealth* v. *Williams*, *supra*, quoting *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992). "A strategic decision by an attorney, however, amounts to ineffective assistance 'only if it was manifestly unreasonable when made.' " *Commonwealth* v. *Williams*, *supra*, quoting *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999).

We agree with the motion judge that trial counsel was not ineffective because even had the Holy Family Hospital records been offered and admitted in evidence, they merely would have been cumulative of other testimony offered by Dr. Brendel, a highly qualified psychiatrist.[19] See *Commonwealth* v. *Colon*, 449 Mass. 207, 219 (2007) ("no substantial likelihood of a miscarriage of justice where the testimony was cumulative"). That testimony included an extensive detailing of all of Pena's hospitalizations and diagnoses, including testimony about his associated memory problem. Moreover, although Dr. Brendel was not permitted to answer a question about the specific contents of the Holy Family Hospital records, she clearly relied on those records in forming her opinion as to Pena's mental state on the date of the killing.

In addition, counsel's failure to offer the records in evidence (or to make an offer of proof with them when a single answer of

---

[19]The Commonwealth challenges the admissibility of the Holy Family Hospital records on two grounds: (1) Pena would not have been able to lay an adequate foundation that the records were in fact his because a different name and date of birth than Pena's appear on the records; and (2) any of Pena's statements in the records would have been inadmissible hearsay.

Dr. Brendel's was struck) was plainly a strategic decision that was not manifestly unreasonable. Although the records include a diagnosis of "[p]sychotic disorder, not otherwise specified," and "[r]ule out malingering," they also included potentially damaging information that could have bolstered the Commonwealth's contention that Pena was feigning memory problems. While the records indicate that Pena had difficulty remembering information from his past, they also conclude that "there are reasons for [Pena] to be vague and avoidant" because he admitted entering the United States illegally. Consequently, there was a "suspicion of being purposely avoidant and vague on account of his illegal status." The report also states that due to a language barrier, "it is difficult to determine whether [Pena's] responses are due to cognitive impairment or planned evasiveness and avoidance, or one posing as a mental patient." The report further states that Pena "maintains vagueness, and perhaps evasiveness, on questions of where he is staying and whether he has a job somewhere." Finally, the records indicated that the "hesitancy in [Pena's] speech did not appear to be thought blocking but rather a result of calculated efforts to avoid self-revelation and to remain vague and superficial." Given this potentially damaging content, defense counsel was not unreasonable in failing to offer the Holy Family Hospital records in evidence, or declining to pursue the matter further when the judge struck Dr. Brendel's answer.

In sum, defense counsel's handling of the records of the Holy Family Hospital was not likely to have influenced the jury's conclusion and did not create a substantial likelihood of a miscarriage of justice.

3. *Conclusion.* We have examined the record pursuant to G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the verdict of murder in the first degree, regardless of whether such grounds were raised on appeal. We conclude that the evidence supported Pena's conviction of murder in the first degree and that there is no basis on which to reduce that verdict or order a new trial.

*Judgment affirmed.*

*Order denying motion for
a new trial affirmed.*