COMMONWEALTH *vs.* JORGE VASQUEZ.[1]

Hampden. December 8, 2009. - March 26, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Controlled Substances. Evidence,* Certificate of drug analysis. *Constitutional Law,* Confrontation of witnesses, Harmless error. *Error, Harmless. Practice, Criminal,* Confrontation of witnesses, Harmless error.

This court concluded that, for a defendant tried and convicted of violations of the controlled substances laws after the decision of this court in *Commonwealth* v. *Verde,* 444 Mass. 279 (2005), and before the United States Supreme Court issued its decision in *Melendez-Diaz* v. *Massachusetts,* 129 S. Ct. 2527 (2009), the standard of review of the question whether the admission in evidence of certificates of drug analysis violated the defendant's rights under the confrontation clause of the Sixth Amendment to the United States Constitution is whether the record established beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained, regardless of whether defense counsel objected to the admission of such certificates at trial, because any such objection would have been futile and because the constitutional issues at stake for the defendant were substantial. [355-360] SPINA, J., dissenting.

With regard to the trial of indictments charging the defendant with possession and distribution of cocaine, this court could not say that the admission in evidence of certificates of drug analysis without testimony from the analyst who created the certificates, in violation of the defendant's rights under the confrontation clause of the Sixth Amendment to the United States Constitution, was harmless beyond a reasonable doubt, where properly admitted testimony as to the chemical composition of the substances at issue was not so overwhelming as to nullify any effect the admission of the certificates might have had on establishing beyond a reasonable doubt the element of the crimes that the substances were cocaine; therefore, this court reversed the judgments, set aside the verdicts, and remanded the cases for a new trial. [360-368] CORDY, J., concurring in part and dissenting in part, with whom IRELAND and COWIN, JJ., joined.

INDICTMENTS found and returned in the Superior Court Department on November 17, 2005.

The cases were heard by *Tina S. Page,* J.

A panel of Justices of the Appeals Court reported one issue of the case to the Supreme Judicial Court.

[1]The defendant was indicted as Jorge Ortiz and is also known as Jorge Ortiz Vasquez.

*Jon R. Maddox* for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

*Debra S. Krupp*, Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

*Todd C. Pomerleau, Danielle M. Wood, & Sarah M. Unger*, for Pomerleau Wood LLP, amicus curiae, submitted a brief.

MARSHALL, C.J. The defendant was tried and convicted of possession and distribution of cocaine after our decision in *Commonwealth* v. *Verde*, 444 Mass. 279 (2005) (*Verde*), and before the United States Supreme Court issued *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009) (*Melendez-Diaz*); defense counsel did not object at trial to the admission of State police crime laboratory certificates of drug analysis (drug certificates). We consider whether in these circumstances the admission in evidence of the drug certificates in violation of the defendant's rights under the confrontation clause of the Sixth Amendment to the United States Constitution requires reversal of his convictions.

The defendant was convicted of distribution and possession of cocaine. See G. L. c. 94C, §§ 32A, 34. Immediately following trial, he pleaded guilty to subsequent offender charges related to the two distribution convictions. See G. L. c. 94C, § 32A (*c*) and (*d*). During his trial, without objection from defense counsel, the Commonwealth introduced in evidence three drug certificates attesting that certain substances sold or possessed by the defendant were cocaine. The analysts who signed the drug certificates did not testify at trial, and defense counsel had no prior opportunity to cross-examine them. The admission of the drug certificates was in accord with our holding in *Verde*, where we concluded that drug certificates were not "testimonial statements" within the meaning of the confrontation clause of the Sixth Amendment, *Crawford* v. *Washington*, 541 U.S. 36, 53-54 (2004) (*Crawford*),[2] and were admissible against a criminal defendant under the "public records" exception to the hearsay rule. See *Verde, supra* at 284

---

[2] In *Crawford* v. *Washington*, 541 U.S. 36, 53-54 (2004) (*Crawford*), the United States Supreme Court held that admission of "testimonial statements" against a criminal defendant without testimony by the declarant at trial is prohibited by the confrontation clause unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant.

(drug certificates "are well within the public records exception to the confrontation clause"). After the defendant's trial had concluded, the Supreme Court granted certiorari in *Melendez-Diaz, supra.*[3] *Melendez-Diaz* abrogated *Verde,* and the Supreme Court held expressly that drug certificates *are* within the category of out-of-court testimonial statements whose admission in evidence against a criminal defendant triggers the protections of the confrontation clause. See *Melendez-Diaz, supra* at 2532.

The defendant appealed from his convictions, raising a *Melendez-Diaz* challenge for the first time. See *Commonwealth v. Vasquez,* 75 Mass. App. Ct. 446, 451 (2009). A divided panel of the Appeals Court upheld the convictions and reported the "[i]ssues involving the drug certificates" to this court. *Id.* at 462. See G. L. c. 211A, § 12.[4]

As we explain below, defense counsel's actions with regard to the admissibility of the drug certificates must be considered in light of our decision in *Verde,* which unquestionably was binding on the judge. Because any objection to the admissibility of the drug certificates would have been futile, and because the constitutional issues at stake for the defendant are substantial, we review the constitutional error as though preserved by proper objection at trial. Applying that standard to this case, we cannot say that the admission of the drug certificates was harmless beyond a reasonable doubt. See *Commonwealth v. Vinnie,* 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998) (preserved constitutional errors reviewed "to determine whether or not they were harmless beyond a reasonable doubt"). We reverse the judgments, set aside the verdicts, and remand for a new trial.[5]

---

[3]The petitioner in *Melendez-Diaz* v. *Massachusetts,* 129 S. Ct. 2527 (2009) (*Melendez-Diaz*), had appealed from a ruling by the Appeals Court, *Commonwealth* v. *Melendez-Diaz,* 69 Mass. App. Ct. 1114 (2007), *S.C.,* 76 Mass. App. Ct. 229 (2010), upholding his convictions of distributing and trafficking in cocaine, a decision reached by the Appeals Court in reliance on *Commonwealth* v. *Verde,* 444 Mass. 279 (2005) (*Verde*). See *Melendez-Diaz, supra* at 2531. On remand, the Appeals Court held that the admission of the drug certificates in that case was not harmless beyond a reasonable doubt, and reversed the defendant's convictions. See *Commonwealth* v. *Melendez-Diaz,* 76 Mass. App. Ct. at 235.

[4]The defendant subsequently applied for further appellate review with regard to the sufficiency of certain evidence. We denied his application.

[5]We acknowledge the amicus briefs filed by the Committee for Public Counsel Services and Pomerleau Wood LLP on behalf of the defendant.

1. *Facts.* We first summarize the facts as the judge at this jury-waived trial could have found them, reserving discussion of certain facts to later sections of this opinion.

In 2005, the Hampden County narcotics task force (task force), operating under the auspices of the State police, was investigating narcotics trafficking in the South End section of Springfield. Acting on information developed in the course of the investigation, on July 7, 2005, State Trooper Henot Rivera, a member of the task force, went undercover to 284 Dwight Street Extension, apartment 4 left (4L), to attempt to purchase cocaine from an individual known to him only as "Flaco," whom Rivera later identified as the defendant. Rivera knocked on the door of apartment 4L, was allowed inside by an unknown man, and was then introduced to the defendant. Rivera, who testified that all of his conversations with the defendant were in Spanish, asked the defendant for an "eight ball."

Rivera testified that the defendant "sent" an unknown man "to retrieve that amount of crack cocaine"; the man left the apartment and after returning gave the defendant "the crack cocaine that [Rivera] had ordered," which Rivera purchased from the defendant for $120 in prerecorded police "buy money." The entire transaction took approximately five minutes. On leaving the apartment, Rivera testified that he gave "the eight ball of crack cocaine" to an "evidence officer," who took the material to a State police crime laboratory to be analyzed.

The task force's investigation of narcotics distribution at 284 Dwight Street Extension was then temporarily suspended because of another law enforcement operation in the area. On October 18, 2005, Rivera again returned in an undercover capacity to apartment 4L. He was met on the fourth-floor porch outside the apartment by the same unknown man who had allowed him into the apartment on July 7, 2005. When Rivera said that he wanted to purchase crack cocaine, the defendant came out of the apartment onto the porch where Rivera asked for an "eight ball of crack." The defendant only had "sixteenths," which, Rivera testified, were "smaller amounts of crack." The defendant, in Spanish, "called down" to "Munchy," later identified as Juan Rebollo, and "summonsed him up to bring an eight ball of crack." When Rebollo came to the fourth floor, the defendant invited Rivera

into the apartment, where the defendant told Rebollo, "Go ahead and sell [Rivera] the crack." On cross-examination, Rivera testified that the defendant's "exact words" to Rebollo were, "Sell to him." Rivera testified that he then purchased "an eight ball of crack cocaine" from Rebollo for $120 in marked police "buy money," and then followed the same procedure he had used on July 7 for securing and analyzing the materials.

On October 20, 2005, police officers executed a search warrant for 284 Dwight Street Extension, apartments 4L and 2R. They encountered a number of individuals throughout apartment 4L, including the defendant, from whom they recovered $493 in cash and some keys. From apartment 4L they also recovered a pair of scissors, sandwich bags, a scale, $274 in a "running" toilet bowl, a "walkie-talkie," a set of keys, a utility bill, and a clear white bag containing a white powdery substance. From apartment 2R, they recovered a strong box with $2,905 in cash, rubber bands, and some documents in the defendant's name, among other things. The defendant was arrested at the scene.

2. *The trial.* Through Trooper Rivera, the prosecutor introduced in evidence the substances that Rivera purchased on July 7 and October 18, as well as corresponding drug certificates attesting that each substance contained cocaine. Through Trooper Juan Colon, another member of the task force, the Commonwealth introduced in evidence a small bag of white powder recovered on October 20 from apartment 4L, and a corresponding drug certificate attesting that the substance was cocaine. Defense counsel did not object to the admission of any of the alleged narcotics or the drug certificates,[6] nor did he object to the Commonwealth's characterization of the substances as "drugs" or "crack cocaine" in the prosecutor's questions. In his closing argument, defense

[6]Each drug certificate introduced in evidence was prepared as a notarized affidavit signed by a State police crime laboratory chemist and stated, among other things, that the substance analyzed was "Cocaine, a derivative of coca leaves, and a Class B Controlled Substance as defined under Chapter 94C, Section 31 of the General Laws." The drug certificates also bore the following legend: "Chapter 22C, Section 39 A certificate by a chemist of the department of the result of an analysis made by him of a drug furnished him by a police officer of the department, signed and sworn to by such chemist, *shall be prima facie evidence of the composition, quality, and weight of such drug*" (emphasis added).

counsel appeared to concede that the substances in question were narcotics. For example, he told the judge that the police "found no fingerprints on anything they had in terms of three separate sets of drugs." At another point in his closing argument, he called the materials "contraband." The defendant, however, did not stipulate that the substances were cocaine.

The defense was mistaken identity. Defense counsel called three witnesses — the defendant, his girl friend, and the eleven year old son of the defendant's girl friend — for the purpose of establishing that, at the time of the alleged narcotics sale on July 7, 2005, all three were driving from Springfield to John F. Kennedy International Airport in New York City, where the son would fly to Puerto Rico. The viability of the alibi was severely tested at trial.

In addition, the defendant testified that he had not witnessed the transaction between Trooper Rivera and Juan Rebollo on October 18, 2005. Rebollo was called by the defense and questioned about the October 18 transaction. He largely confirmed the defendant's testimony that the defendant was not involved in the October 18 drug deal. On cross-examination by the Commonwealth, Rebollo admitted that in connection with a plea bargain on charges related to the October 18 transaction, he had admitted under oath to the truth of facts read into the record that he, Rebollo, had been instructed by the defendant to sell crack cocaine to Rivera. Rebollo explained that the statement of facts he swore to was not correct, and that he vouched for its truth only because "I thought that the deal they were offering me was a deal that was convenient for me . . . ."

We turn now to the question of the appropriate standard of review.

3. *Standard of review.* A decision whether to affirm, modify, or reverse a conviction focuses in the first instance on the standard of review on appeal. In general, where a proper objection is lodged at trial to an alleged infringement of a constitutional right, we review to decide "whether the record establishes 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Commonwealth* v. *Peixoto*, 430 Mass. 654, 660 (2000), quoting *Chapman* v. *California*, 386 U.S. 18, 24 (1967).[7] Where the constitutional challenge has

---

[7] Some constitutional errors amount to "structural error which defies analysis

not been properly preserved, we generally apply a standard of review less favorable to the defendant: we consider whether the error created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Amirault*, 424 Mass. 618, 646-647 (1997) (substantial risk standard requires reversal of verdict "if the evidence and the case as a whole . . . [leaves] us with a serious doubt that the defendants' guilt [has] been fairly adjudicated" [citations omitted]).

Determining the proper standard of review is no rote matter. The presence or absence of an objection at trial, in itself, is not the sole criterion by which we determine the appropriate standard of appellate scrutiny. See, e.g., *Commonwealth* v. *Rembiszewski*, 391 Mass. 123, 126 (1984), and cases cited (excusing defendant's failure to object to constitutional error because state of law at trial did not "afford the defendant a genuine opportunity to raise his claim"). In this case several circumstances weigh in favor of according the defendant the more favorable standard of appellate review.

First, objection to the admission in evidence of the drug certificates would have been futile because the judge was required to follow *Verde*. It is true, of course, that the Supreme Court, and not this court, is the final arbiter of what the Federal Constitution demands, and that *Verde* was not controlling for purposes of Federal review. See *Commonwealth* v. *Masskow*, 362 Mass. 662, 667 (1972) ("We are of course bound by decisions of the Supreme Court on questions of Federal law . . ."). Nonetheless, it is also true that this court is the highest appellate authority in the Commonwealth, and our decisions on all questions of law are conclusive on all Massachusetts trial courts and the Appeals Court. Principles of stare decisis required the trial judge in this case to take *Verde* "at face value until formally altered." *Sarzen* v. *Gaughan*, 489 F.2d 1076, 1082 (1st Cir. 1973). See, e.g., *Commonwealth* v. *Calderon*, 431 Mass. 21, 24-28 (2000) (reversal of conviction required where judge failed to follow procedures for peremptory challenges established by

by harmless error standards." *Commonwealth* v. *Pinckney*, 419 Mass. 341, 342 (1995), citing *Sullivan* v. *Louisiana*, 508 U.S. 275, 280-282 (1993). The error at issue here is not structural. See *Melendez-Diaz, supra* at 2542 n.14 (declining to address "in the first instance" question "whether the error [in admitting drug certificates] was harmless").

this court). Cf. *Commonwealth* v. *Dube*, 59 Mass. App. Ct. 476, 485-486 (2003), and cases cited (Appeals Court has "no power to alter, overrule or decline to follow the holding of cases the Supreme Judicial Court has decided").[8] In this sense, the position of a Massachusetts trial court vis-à-vis this court is not unlike the position of a Federal District Court to its corresponding Circuit Court of the United States Court of Appeals. "District courts are, of course, bound by the law of their own circuit . . . ." *Zuniga* v. *United Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987), quoting *Hasbrouck* v. *Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981), cert. denied, 459 U.S. 828 (1982). See *Eulitt* v. *State of Me., Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004) (same); *United States* v. *Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) (same). No matter how strongly a Massachusetts trial judge may disagree with this court on an interpretation of Federal constitutional law, or how confident a judge may be that the Supreme Court will disagree with this court on such a question, so long as our holding has not been abrogated, it is the law the judge *must* apply.[9]

Because the judge was required to follow our holding in *Verde*,

---

[8]The trial in this case occurred before the Supreme Court granted certiorari in *Melendez-Diaz, supra*. See note 3, *supra*, and accompanying text. Because the judge was bound by *Verde*, the outcome would be no different had the trial occurred after the Supreme Court had granted certiorari, but before it had issued the *Melendez-Diaz* decision.

[9]Other State courts have applied a similar futility analysis. See, e.g., *St. Pierre* v. *State*, 96 Nev. 887, 890-892 (1980), quoting *United States* v. *Wanger*, 426 F.2d 1360, 1360 (9th Cir. 1970) (excusing failure to object where State court's interpretation of Federal Constitution was binding on trial court at time of trial, but was abrogated by Supreme Court while case was on direct appeal; objection "would have been futile" as erroneous jury instruction "had been upheld by this court on prior occasions"; court refused to fault defendant or his attorney for failure to object to instructions "which applied the law as it was firmly established" or to request instructions which, "at the time of trial, would have been inconsistent with the law as it then existed"); *Black* v. *State*, 816 S.W.2d 350, 362-364 (Tex. Crim. App. 1991) (same; objection "would have been an effort in futility"; given "settled state" of State case law interpreting Federal Constitution at time of trial, court refused to fault defendant or his attorney for failure to object; under "established precedent," trial judges "would have been correct in overruling the objection"). Cf. *State* v. *Goodyear*, 100 Ariz. 244, 247-248 (1966) (excusing failure to object where objection "would have been futile" given "established rule of evidence" that was abrogated after trial by Supreme Court decision); *People* v. *Hillery*, 62 Cal. 2d 692, 711-712 (1965) (same).

a point not mentioned by the Appeals Court, see *Commonwealth v. Vasquez*, 75 Mass. App. Ct. 446, 458-459 (2009), the parties' extensive arguments about whether *Melendez-Diaz* was presaged by *Crawford*, or whether the former case constitutes new Federal constitutional doctrine in its own right, miss the mark. See *Commonwealth* v. *Vasquez*, *supra* at 451-460. For regardless whether *Crawford* foreshadows *Melendez-Diaz*, in Massachusetts courts the line from *Crawford* to *Melendez-Diaz* was bisected by our decision in *Verde*. *Verde* distinguishes this matter from cases in which the line from a new constitutional doctrine to its latest development is unbroken, and thus requires a different analysis.[10]

Second, because an objection to the admission of a drug certificate would have been futile, the rationale for denying the defendant a more favorable standard of review is not applicable. Objections at trial serve an important remedial purpose in our adversary system. The "rationale behind the requirement of a specific [objection] is to enable the judge to make any necessary correction" at trial. *Commonwealth* v. *McDuffee*, 379 Mass. 353, 359 (1979). See *Commonwealth* v. *Torres*, 420 Mass. 479, 482-483 (1995) (same). Here, a confrontation clause objection to the admission of the drug certificates, no matter how compelling, could not have accomplished the intended purpose of an objection, for the judge would have had no choice but to overrule the objection. Thus, for the attorney who raised a confrontation clause challenge to the admission of a drug certificate and for the attorney who did not raise such an objection, the result for the defendant would have been the same — admission of a drug certificate. It would serve no purpose to treat the two defendants

---

[10]The Commonwealth points to several of our post-*Verde* decisions that, it maintains, should have put defense counsel on notice that the drug certificates were "testimonial." See *Commonwealth* v. *Robinson*, 451 Mass. 672, 678-680 (2008) (police testimony of statement made by unavailable witness not testimonial under *Crawford* where, among other things, statement was made without police prompting); *Commonwealth* v. *Lao*, 450 Mass. 215, 224-227 (2007) (wife's statements to police about defendant's actions testimonial under *Crawford* but her statements to third party not testimonial); *Commonwealth* v. *DeOliveira*, 447 Mass. 56, 58 (2006) (minor rape complainant's statement to emergency room personnel not testimonial under *Crawford*). In those cases we did comment on the uncertain scope of *Crawford*, but none concerned the admissibility of drug certificates, and nothing in any of the cases relied on by the Commonwealth is incompatible with our ruling in *Verde*, or suggests that we doubted *Verde*'s continued viability.

differently on appellate review. See *Ohio* v. *Roberts*, 448 U.S. 56, 74 (1980) ("The law does not require the doing of a futile act"). But see *Crawford, supra* at 68. See generally note 9, *supra*; Newton, An Argument for Reviving the Actual Futility Exception to the Supreme Court's Procedural Default Doctrine, 4 J. Appellate Prac. & Process 521 (2002).

Finally, considerations of fundamental fairness weigh against applying the less favorable standard of review to the defendant. Although *Crawford* effected a clear break from prior confrontation clause jurisprudence, see *Whorton* v. *Bockting*, 549 U.S. 406, 416 (2007) (*Crawford* announced "new rule" "flatly inconsistent with the prior governing precedent"), the reach of *Crawford* was, and remains, vigorously debated. See, e.g., *State* v. *O'Maley*, 156 N.H. 125, 134-137 (2007), cert. denied, 129 S. Ct. 2856 (2009) (discussing various disparate interpretations of *Crawford*). See also *Briscoe* v. *Virginia*, 130 S. Ct. 1316 (2010) (vacating and remanding post-*Crawford* confrontation clause decision of Supreme Court of Virginia in light of *Melendez-Diaz*). Our holding in *Verde* was not an aberration, and reflected the unsettled nature of confrontation clause jurisprudence in *Crawford*'s wake,[11] an uncertainty not of the defendant's or his counsel's making.

---

[11]See, e.g., *United States* v. *Ellis*, 460 F.3d 920, 923-927 (7th Cir. 2006) (documents indicating that medical tests showed presence of drugs in defendant's blood and urine not testimonial under *Crawford*, despite having been prepared in contemplation of prosecution); *Pruitt* v. *State*, 954 So. 2d 611, 616-617 (Ala. Crim. App. 2006) (drug certificate not testimonial under *Crawford* and admissible under business records exception to hearsay rule); *People* v. *Geier*, 41 Cal. 4th 555, 607 (2007), cert. denied, 129 S. Ct. 2856 (2009) (report of deoxyribonucleic acid [DNA] test results not testimonial); *State* v. *Cunningham*, 903 So. 2d 1110, 1119-1121 (La. 2005) (statute allowing admission of drug certificate as prima facie evidence unless defendant subpoenas analyst before trial does not violate confrontation rights under *Crawford*); *State* v. *O'Maley*, 156 N.H. 125, 139-140 (2007), cert. denied, 129 S. Ct. 2856 (2009) (report of blood test results not testimonial); *State* v. *Dedman*, 136 N.M. 561, 569 (2004) (same); *State* v. *Forte*, 360 N.C. 427, 435, cert. denied, 549 U.S. 1021 (2006) (same for report of DNA test results); *Magruder* v. *Commonwealth*, 275 Va. 283, 296-306 (2008), vacated and remanded sub nom. *Briscoe* v. *Virginia*, 130 S. Ct. 1316 (2010) (where State submits drug certificate in evidence, State statute granting defendant certain rights adequately protects defendant's rights under confrontation clause). Cf. *Commonwealth* v. *Carter*, 593 Pa. 562, 569 n.3, 574 (2007) (drug certificate admissible under business exception to hearsay rule and admission without trial testimony of analyst does not violate confrontation clause, applying pre-*Crawford* law on collateral review).

Drug certificates, the Supreme Court has now held, fall within the "core class of testimonial statements" that trigger confrontation clause protections. *Melendez-Diaz, supra* at 2532. In the language of our jurisprudence, the "substantial nature" of the rights involved is "unquestionable." *Commonwealth* v. *Stokes*, 374 Mass. 583, 589 (1978). Admission of the drug certificates was constitutional error, but it was error in circumstances where contrary precedent had enjoyed a long, unproblematic history in this Commonwealth, see *Verde, supra* at 282-283 (noting admission of drug certificates as early as 1923 and noting "ancient" common-law principle of public records exception), and where our established precedent had been explicitly reaffirmed by this court in the wake of *Crawford.* See *Verde, supra* at 284. The defendant should not be penalized because of any doubt on the state of the law that *Verde* may have created.

We next consider whether admission of the drug certificates at trial was harmless beyond a reasonable doubt.

4. *Merits.* Before a "[F]ederal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman* v. *California*, 386 U.S. 18, 24 (1967). The "essential question" in analyzing harmlessness beyond a reasonable doubt is "whether the error had, or might have had, an effect on the [fact finder] and whether the error contributed to or might have contributed to the [findings of guilty]." *Commonwealth* v. *Perrot*, 407 Mass. 539, 549 (1990). As an appellate court, we ask whether "on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the [fact finder] and did not contribute to the [fact finder's findings]."[12] *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010). Our review looks "to the basis on which 'the [fact

---

[12]To that end, we "look to factors such as 'the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; . . . and the weight or quantum of evidence of guilt.' " *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010), quoting *Commonwealth* v. *Dagraca*, 447 Mass. 546, 553 (2006). Although we have articulated factors guiding our review for harmless error beyond a reasonable doubt, there is no uniform standard for all cases; the results of our review are

finder] *actually rested* its verdict' " (emphasis in original). *Sullivan* v. *Louisiana*, 508 U.S. 275, 279 (1993), quoting *Yates* v. *Evatt*, 500 U.S. 391, 404 (1991). The inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error" (emphasis in original). *Sullivan* v. *Louisiana, supra.*

The standard of harmlessness beyond a reasonable doubt is a stringent one, for if "loosely applied," the concept of harmless error "can serve too readily as a bridge for a procession of mistakes and injustices." *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 (1987), quoting *Commonwealth* v. *Marini*, 375 Mass. 510, 521 (1978). For the reasons we now discuss, we cannot say that the admission of the drug certificates was harmless beyond a reasonable doubt.

In a case charging a narcotics offense, the Commonwealth must prove beyond a reasonable doubt "that a substance is a particular drug" because such proof is an element of the crime charged. *Commonwealth* v. *McGilvery*, 74 Mass. App. Ct. 508, 511 (2009). See, e.g., G. L. c. 94C, §§ 32-32E, 34. See also *Commonwealth* v. *Farley*, 443 Mass. 740, 745, cert. denied, 546 U.S. 1035 (2005) (Commonwealth must prove "each and every element" of crime beyond reasonable doubt). The Commonwealth cannot meet its burden of proving the trafficking in, distribution, or possession of cocaine without proof that the substance at issue was, beyond a reasonable doubt, "cocaine" and not another drug or ersatz cocaine. See *United States* v. *Miller*, 471 U.S. 130, 142 (1985) ("a conviction cannot stand if based on an offense that is different from that alleged in the grand jury's indictment"). The three drug certificates introduced against the defendant as part of the Commonwealth's prima facie case were potent, unrefuted evidence that the substances at issue were cocaine. Presumably for that reason the Commonwealth does not challenge the damaging evidentiary force of the drug certificates for the defendant. Rather, it argues that other evidence introduced at trial established circumstantially that the materials purchased or seized were, in fact, cocaine and sufficed to meet its burden of

determined by the circumstances of each case. See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 697 (1983) (factors listed above, though "useful," are "not exclusive or exhaustive").

proof on that issue, citing *Commonwealth* v. *Dawson*, 399 Mass. 465, 467 (1987) (proof that substance is particular drug "may be made by circumstantial evidence").

We agree that there was circumstantial evidence properly admitted at trial that the white powder sold to Trooper Rivera on July 7 and October 18, 2005, was cocaine.[13] The question we are asked to resolve, however, is not, in the abstract, the strength of the Commonwealth's case, but whether we can be satisfied, beyond a reasonable doubt, that the erroneously admitted certificates of analysis had little or no effect on the verdicts. Then, and only then, can we say that their admission in evidence was harmless beyond a reasonable doubt. It is not enough for the Commonwealth to demonstrate that its other, properly admitted evidence was "sufficient" to convict the defendant or that the inadmissible evidence was "consistent" with the admissible evidence. *Commonwealth* v. *Tyree*, *supra* at 701, quoting *Commonwealth* v. *Dagraca*, 447 Mass. 546, 554-555 (2006). Rather, to establish harmlessness beyond a reasonable doubt, the Commonwealth must show that other properly admitted evidence of guilt is "overwhelming," in the sense that it is "so powerful as to 'nullify any effect' " that the improperly admitted evidence "might have had" on the fact finder or the findings. *Commonwealth* v. *Tyree*, *supra* at 704 n.44, quoting *Commonwealth* v. *Dagraca*, *supra* at 555.

Moreover — and of particular relevance to this case — where the improperly admitted evidence directly implicates the Commonwealth's proof of an element of the crime, our inquiry must necessarily focus on the effect of the improperly admitted evidence as it pertains to that element. See, e.g., *Commonwealth* v. *Depina*, *ante* 238, 249 (2010) (admission of ballistics certificate harmless beyond reasonable doubt because other "lawfully admitted evidence [at trial] *that the revolver was a working firearm* and *that the ammunition was designed for use in a firearm*" was "overwhelming" [emphases added]); *Commonwealth* v. *Rainwater*, 425 Mass. 540, 551 (1997), cert. denied, 522 U.S. 1095 (1998), abrogated on other grounds by *Texas* v. *Cobb*, 532 U.S. 162, 168 & n.1 (2001) (assuming admission of evidence was constitutional error, error was harmless beyond reasonable doubt

---

[13]As we discuss, *infra*, there was no comparable evidence concerning the substance seized on October 20, the day the search warrant was executed.

where such evidence "supplied no missing element in the proof" of crimes for which defendant was convicted); *Commonwealth* v. *Sinnott, supra* at 873 (if erroneously admitted evidence "is corroborative of other evidence which, without such corroboration, permits reasonable doubt concerning a necessary element of proof," erroneously admitted evidence "is not merely cumulative because it would *necessarily* have contributed to the verdict, and reversal would be required" [emphasis added]).[14] The inquiry here, therefore, is whether the testimony of the police officers (or any other evidence not including the drug certificates) as to the chemical composition of each substance was so "overwhelming" as to "nullify any effect" the admission of the drug certificates might have had on establishing beyond a reasonable doubt the element of the crimes that the substances were "cocaine." The analysis of the strength of the Commonwealth's other evidence is significant only if, and to the extent that, it can bring us to the conclusion that the admission of the drug certificates had little or no effect in proving that element.

We consider first the probative impact of the drug certificates. Just how damaging the admission of the drug certificates was to the defendant is apparent when we consider our earlier underlying rationale for admitting drug certificates without live testimony from the chemical analysts who swore to their veracity. In *Verde*, we stated that drug certificates were "merely records of primary fact, with no judgment or discretion on the part of the analysts," and that such certificates "state the results of a well-recognized scientific test determining the composition and quantity of the substance." *Verde, supra* at 282, 283. *Verde*'s reasoning that drug analyses and drug certificates are both ministerial in nature and always reliable would have been entirely familiar to the fact finder in this case, a judge, as well as to the prosecutor and defense counsel. Certificates such as those admitted in this case are a staple in virtually every drug case; they assure the fact finder, to a degree that virtually no amount of circumstantial

---

[14]Cf. *Commonwealth* v. *Repoza*, 400 Mass. 516, 522 n.7, cert. denied, 484 U.S. 935 (1987) (erroneous instruction on intent not harmless beyond reasonable doubt where defendant did not concede that murder, not manslaughter, had occurred, because there is "always an *element* of intent for the jury to determine in murder cases in which the defendant does not concede that a conviction of murder in the first or second degree would be warranted if the proper person were prosecuted" [emphasis added]).

evidence can, that the charged substance is in fact a particular illegal drug.

The Commonwealth called seven witnesses, all police officers, in its case-in-chief. None testified to any expertise or training in chemical analysis, and none was involved in generating the drug certificates used at trial. There was no evidence of "field tests" performed on the substances purchased by Trooper Rivera or seized from the defendant's residence. Contrast *Commonwealth v. Connolly*, 454 Mass. 808, 831 (2009).[15] None of the officers observed the effects of the substances on anyone ingesting them. See *Commonwealth v. Dawson*, 399 Mass. 465, 467 (1987) ("great weight of authority in this country" permits "an experienced *user* of a controlled substance to testify that a substance that he saw and used was a particular drug" [emphasis added]). What the police witnesses *did* say concerning the chemical composition of the substances at issue is that they relied on the drug certificates for their testimony that the substances they purchased or seized were "drugs" or "cocaine."

The principal witness for the prosecution, Trooper Rivera, testified in general terms that he had "quite a bit of training having to do with identifying, tracking, and monitoring narcotics operations," that he was "familiar with crack cocaine," as well as "the terminology used by dealers and users regarding purchasing and selling crack cocaine on the streets of Springfield," and that he had previously made hundreds of undercover purchases of crack cocaine.[16] Rivera also testified that, based on his "training and experience," the substance in the bag he purchased on July 7, 2005, was "consistent with crack cocaine."[17] However, when

---

[15]But see National Research Council, Strengthening Forensic Science in the United States, A Path Forward, 134-135 (2009) ("Most controlled substances are subjected first to a field test for *presumptive identification.* This is followed by gas chromatography-mass spectrometry (GC-MS), in which chromatography separates the drug from any diluents or excipients, and then mass spectrometry is used *to identify the drug*" [emphases added]). See also *Callaham v. United States*, 937 A.2d 141, 147 (D.C. 2007) ("a positive field test, standing alone, [does not] prove beyond a reasonable doubt that the substance was cocaine").

[16]Rivera testified that he asked the defendant for an "eight ball" on both July 7 and October 18, and received the purported drugs in return.

[17]Protocols for the analysis of cocaine, heroin, and marijuana samples promulgated by the State police require that a chemical analysis be conducted for each substance; identification of the substance on the basis of a visual inspection alone is not authorized.

pressed on cross-examination, Rivera stated: "This is how I determine those drugs were in fact drugs, by the certificate of analysis that was the analysis that was performed by a chemist." When asked how he knew that the substances that he purchased on October 18, 2005, were the same "drugs" entered in evidence, he stated: "Again, the form — the custody form which was filled out indicates that. And also based on the lab number which corresponds with the lab numbers which are on the drugs themselves, and the envelope which is filled out in the name of Jorge Vasquez, all indicate that these are the drugs."

Rivera's testimony that the substance he purchased on July 7 was "consistent with cocaine" was probative of the distribution charges. The judge did not, however, make a finding, prior to Rivera's testimony, that Rivera's experience permitted him to offer an opinion that the substance was "cocaine." See *Commonwealth* v. *Dawson, supra* (when police or drug-user witness testifies as to nature of substance, judge "will first have to make a finding" that witness's experience with drug would "permit him to give an opinion as to what drug a particular substance was;" qualified witness's "knowledge and competence" and "lack of training in chemical analysis, will bear on the weight to be given to his testimony"). See also note 17, *supra.* Moreover, "it would be a rare case in which a witness's statement that a particular substance looked like a controlled substance would alone be sufficient to support a conviction." *Commonwealth* v. *Dawson, supra.* See *Commonwealth* v. *Melendez-Diaz,* 76 Mass. App. Ct. 229, 233 (2010) (admission of drug certificates *not* harmless beyond reasonable doubt where "word 'cocaine' frequently was used by the police, but at no time did the officers cite any objective evidence, criteria, or field tests; they did not articulate how their expertise permitted them to identify the substances as cocaine"); *Cook* v. *United States,* 362 F.2d 548, 549 (9th Cir. 1966) (noting "judicially" that "whether or not a powder or substance is a narcotic cannot be determined by mere inspection of its outward appearance").

Mistaken identification of cocaine by trained and experienced law enforcement personnel is not unknown in the annals of our law. See, e.g., *Commonwealth* v. *LaVelle,* 414 Mass. 146, 148 (1993) (undercover informant purchased substance police detectives "presumed to be cocaine" but that laboratory test proved

was another substance); *Care & Protection of Frank*, 409 Mass. 492, 495-496 (1991) (police seized powdery substance from mother that they believed was cocaine but that laboratory tests proved was another substance). Cf. *Commonwealth* v. *Scott*, 428 Mass. 362, 363 (1998) (defendant sold "bag which purportedly contained cocaine but actually contained baking soda"). See also G. L. c. 94C, § 32G (prohibiting possession with intent to distribute counterfeit substance).[18]

As to the substance seized from the defendant's apartment on October 20, 2005, the drug certificate for that was introduced through Trooper Colon, about whose specific experience and training in investigating the distribution of narcotics or in identifying substances as narcotics, if any, there was no testimony. Cf. *Commonwealth* v. *Dawson*, *supra*. The drug certificate identifying the substance as cocaine was the *only* evidence pertaining to the substance's chemical nature.[19] On this record we cannot say that the drug certificates had no effect on the fact-finding judge, and did not contribute to the verdicts.

To be sure, in addition to the drug certificates, other evidence tied the defendant to wrongdoing of some sort, specifically drug dealing. The doors to the defendant's apartment, as multiple officers testified, were barricaded, and before the October 18 purchase there were several men hovering on the stairs of the building who asked Rivera his purpose before permitting him to proceed to the fourth floor. Evidence seized from 284 Dwight Street Extension included a scale, rubber bands, a substantial amount of cash, sandwich bags, and a walkie-talkie — all relevant on the issue of distribution. But none of this properly admitted evidence established that the substances purchased and seized were "cocaine,"

---

[18]The Committee for Public Counsel Services (CPCS) has provided us in its amicus brief with examples of numerous unreported cases in which defendants were arrested and charged with a violation of the controlled substances statutes of the Commonwealth because a police officer believed that a substance was an illegal controlled substance, but where subsequent testing by the Commonwealth resulted in a negative finding.

[19]Trooper Colon made one conclusory reference to the substance seized on October 20, 2005, as "some narcotics." Immediately thereafter, he referred to what he seized as one "clear plastic bag with white powder substance." Powdered cocaine is a nondescript white powder, visually indistinguishable from other white powders. See *Cook* v. *United States*, 362 F.2d 548, 549 (9th Cir. 1966).

as the indictments charged.[20] See, e.g., *Commonwealth* v. *Soares*, 384 Mass. 149, 152-153 n.4, 156 (1981) (discussing evidence that defendant was conspirator in alleged drug distribution operation, and noting in passing that police seized in certain residence, among other things, plastic bag, large sum of money, bills, scale, and package of white powder identified by laboratory analysis as methamphetamine). This is not a case where the facts independent of the drug certificates overwhelmingly prove the nature of the substances sold to the undercover police or recovered from the defendant's apartment. Contrast *Commonwealth* v. *Doherty*, 411 Mass. 95, 102 (1991), cert. denied, 502 U.S. 1094 (1992), quoting *Francis* v. *Franklin*, 471 U.S. 307, 325-326 (1985) (erroneous intent instruction harmless beyond reasonable doubt where "principals' intent was not in dispute" because facts " 'overwhelmingly preclude[d]' the absence of an intent to kill" on part of principals). Cf. *Commonwealth* v. *Depina*, *ante* 238, 249-250 (2010). To conclude, as the dissent is willing to do, *post* at 373 (Cordy, J., dissenting in part and concurring in part), that the only direct evidence that the white powder purchased or seized was cocaine, namely, uncontroverted scientific evidence that the Legislature has declared to be prima facie proof that the powder is cocaine, see G. L. c. 22C, § 39, meant little or nothing to the fact finder would turn the harmless error standard on its head. To reach such a conclusion beyond a reasonable doubt in this case would eviscerate the standard altogether.

We place little weight on defense counsel's decision not to challenge the admission of the drug certificates. The certificates were admitted by a judge who was the trier of fact at a time when Massachusetts law provided that the admission of drug certificates without an opportunity to cross-examine the chemical analyst who prepared them did not violate the confrontation clause of the Sixth Amendment. See *Verde, supra* at 283-284. Even so, the defendant did *not* stipulate that the substances were, in fact, cocaine. See *Melendez-Diaz, supra* at 2542 (defense attorneys and their clients "will often stipulate to the nature of the substance in the ordinary drug case"). The Commonwealth's

[20]Although it appears from the officers' testimony for the Commonwealth that apartment 4L had been under investigation for some time for suspected drug-related activity, the fact of the investigation says nothing about the nature of the substances seized and purchased by law enforcement authorities.

burden of proving every element of its case cannot be transferred to the defendant because of his counsel's choice of defense. *Commonwealth* v. *Shea*, 398 Mass. 264, 269 (1986) ("defendant's theory of his case cannot relieve the Commonwealth of its burden of proving every element of a crime beyond a reasonable doubt").[21] Cf. *Melendez-Diaz, supra* at 2540 ("More fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court").

We disagree with the Commonwealth that reversal is not required because the chemical nature of the substances was "an uncontested issue at trial." The identity of the substances purchased or seized was very much a live issue, as the Commonwealth's case depended on it. By giving the defendant the benefit of the harmless beyond a reasonable doubt standard, as we have, the defendant is effectively in the same position as if he *had* objected to the admission of the drug certificates. A defendant who objects to a Federal (or State) constitutional error that goes to the heart of the government's case has no further obligation, if he wishes to challenge that error on appeal, to contest the issue. There is, and should be, no burden on a defendant to *continue* to object to evidence at the risk of losing his constitutional rights.[22] In the case of a preserved constitutional error, as we have here, the constitutional error cannot go unchecked on appeal because the defendant did not build his defense around it.

5. *Conclusion.* The judgments are reversed, the verdicts are set aside, and the cases are remanded to the Superior Court for a new trial consistent with this decision.

*So ordered.*

[21]The judge, the prosecutor, and defense counsel all likely would have viewed the drug certificates objectively as establishing beyond a reasonable doubt the element of the crimes of distributing and possessing "cocaine." See G. L. c. 94C, §§ 32A, 34. There would have been no reason for the Commonwealth or defense counsel to dwell on the point, and there would have been no reason for the judge to look beyond the certificates to find that the Commonwealth had proved the "cocaine" element of the charged crimes beyond a reasonable doubt.

[22]It would also serve no practical purpose in effect to require a defendant who has objected to evidence (the identification of the white powder) to repeat at each point in the trial when white powder is mentioned, "I do not concede that it is cocaine."

CORDY, J. (concurring in part and dissenting in part, with whom Ireland and Cowin, JJ., join). I agree that the standard of review to be applied in this case is whether the Federal constitutional error, admission of the certificates of drug analysis (drug certificates), was harmless beyond a reasonable doubt. I also agree that an appellate court must ask whether "on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the [fact finder] and did not contribute to the [fact finder's findings]." *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010).

I further agree that in determining whether the tainted evidence may have had an effect on the fact finder or contributed to his findings of guilt, "we examine various factors, including the importance of the evidence in the prosecution's case; the relationship between the [tainted] evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; . . . and the weight or quantum of evidence of guilt." *Commonwealth* v. *Dagraca*, 447 Mass. 546, 553 (2006), citing *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983) (*Dagraca* factors). See *ante* at 360 n.12. Although these factors guide our review for harmless error beyond a reasonable doubt, "there is no uniform standard for all cases; the results of our review are determined by the circumstances of each case." *Id.*, citing *Commonwealth* v. *Mahdi*, *supra* at 697.

Where I disagree with the court is in the application of this standard to the case before us. Considering all the evidence in the context of the case as it was actually tried, through the lens of the *Dagraca* factors, I conclude that the admission in evidence of the drug certificates in the two distribution indictments was harmless beyond a reasonable doubt.[1]

In brief,[2] the Commonwealth's evidence at trial was that the

---

[1]For the reasons explained below, I agree that the defendant's conviction of possession with intent to distribute the cocaine found in apartment 4L when it was searched on October 20, 2005, should be reversed, because the erroneous admission of the drug certificate as to that substance was not harmless beyond a reasonable doubt.

[2]The opinion of the court sets out in greater detail the evidence at trial. I do not disagree with the court's more extensive summary of that evidence.

Hampden County narcotics task force was investigating the sale of cocaine by a man named, "Flaco," out of apartment 4L at 284 Dwight Street Extension in Springfield. An experienced undercover narcotics officer was sent to that address on July 7, 2005, in an effort to meet Flaco and buy cocaine from him. The officer walked up the stairs in the back to the fourth-floor porch where he encountered an individual standing outside the back door of apartment 4L. After knocking, he was permitted to enter the apartment, after which the door was barricaded behind him.

In the apartment, he spoke to Flaco, whom he later identified as the defendant. He told the defendant that he wanted to buy an "eight ball" of cocaine.[3] The defendant then sent another individual who was present in the apartment to retrieve a clear plastic bag containing a substance that the officer observed was "consistent with crack cocaine." The defendant then handed the bag to the officer who, in turn, gave the defendant $120. The officer asked to leave the apartment through the front door. That door was also observed to be barricaded, and another man stood in the hallway just outside.

The undercover officer returned to the same location to make another purchase of crack cocaine from the defendant on October 18, 2005. As he made his way up the rear stairs to the back porch of apartment 4L, he was confronted by several persons who wanted to know the purpose of his visit. When he reached the porch, he met the defendant and asked to buy another "eight ball" of crack cocaine. The defendant had a clear plastic bag in his hand, which, he claimed, contained only "sixteenths" (amounts of cocaine smaller than an eight ball). He then called to another person (Juan Rebollo) to bring up an "eight ball." Eventually, the officer, the defendant, and Rebollo went inside apartment 4L, the doors of which were still barricaded, and the defendant directed Rebollo to sell the officer the eight ball of crack cocaine, which he did in exchange for $120.

Two days later, on October 20, 2005, the officers executed a search warrant on apartment 4L. In executing the warrant, the

---

[3]The undercover officer testified that he had made hundreds of purchases of "crack" cocaine on the streets of Springfield, and was very familiar with the terminology used by drug dealers to describe quantities of crack cocaine, including the term "eight ball."

front door had to be broken down because it remained barricaded. On entering the apartment, the officers found the defendant with Rebollo and two other persons. An additional person had jumped out the window and money was being flushed down the toilet. The defendant was searched, and the officers found $493 in cash on his person. The search also recovered clear plastic sandwich bags, and a plastic bag containing a white powder substance (described in the testimony as "narcotics").[4]

I would apply the *Dagraca* factors as follows. With respect to the first factor, the importance of the evidence, although the certificates were obviously part of the Commonwealth's case and were admitted in evidence along with the drugs, the most important and significant evidence that the defendant illicitly distributed a controlled class B substance (cocaine) on July 7 and October 18, 2005, were his actions and words on those dates. Leaving aside the certificates, the evidence was powerful and established that a person (identified as the defendant) was in the business of selling cocaine out of apartment 4L. The undercover officer came to that location, which was both barricaded and, inferentially, guarded both in front and in back, ordered a quantity of crack cocaine, and was given a clear plastic bag containing rocks of white substances which appeared to be and were plainly represented to be crack cocaine, in exchange for a substantial and definite amount of cash, $120. Virtually this same transaction, involving the same undercover officer, was repeated several months later. When a search warrant was executed at the apartment two days after the last sale, the defendant was present, money was being flushed down the toilet, a confederate jumped out a window, and a large quantity of cash as well as drug weighing and packaging paraphernalia were found in the apartment, along with more white powder. The certificates were at most pro forma; their existence was not even mentioned in the prosecutor's closing argument.[5]

Second, the certificates bore no relationship to the premise of

---

[4]The search of a second apartment, also rented to the defendant, led to the discovery of a large amount of cash in a strong box.

[5]As the United States Supreme Court confirmed, its decision in *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), in no way altered the States' ability to sustain a conviction of drug related offenses through circumstantial evidence. *Id.* at 2542 n.14. The court concedes as much. This court and other courts have repeatedly held that proof of the distribution of the particular

the defense, which was essentially that the defendant was mistaken for someone else who may have been selling cocaine out of his apartment on those dates. While not stipulating that the substances involved in the transactions on July 7 and October 18 were cocaine, the defendant in no way suggested that they might not be. His defense at trial was that he was not present at his apartment on July 7, and in addition to testifying on his own behalf, he called alibi witnesses to corroborate that he was elsewhere. As for October 18, he testified that the undercover officer arrived with another man who asked to speak to Rebollo, to whom he referred them without further interaction. Indeed, the defendant called Rebollo (an admitted crack cocaine seller and user) to testify that he in fact sold the "eight ball of cocaine" on that date, and had already pleaded guilty to having done so. Consistent with the defense, however, Rebollo testified that the defendant was not in the room where and when he sold the cocaine, and that he did not give any of the $120 he received for the "eight ball" to the defendant. This testimony both underscores the complete lack of relationship between the defense in the case and the improperly admitted certificates confirming that the substance sold was cocaine, and firmly corroborates the representations made by the defendant to the undercover officer during the transactions that the drug being sold was cocaine.[6]

Finally, and most important, the evidence that cocaine was

substance can be accomplished without evidence of chemical analysis and expert testimony. See, e.g., *Commonwealth* v. *Dawson*, 399 Mass. 465, 467 (1987), and cases cited. See also *United States* v. *Abuelhawa*, 523 F.3d 415, 422-423 (4th Cir. 2008), rev'd on other grounds, 129 S. Ct. 2102 (2009) (even in absence of drugs, government can establish distribution of cocaine, relying on defendant's statements to others and conversations, in code, regarding drug transactions), citing *United States* v. *Dolan*, 544 F.2d 1219, 1221 (4th Cir. 1976) (circumstantial proof to establish nature of substance may include "testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence").

[6]Not surprisingly, the third factor weighs against the Commonwealth. It was the Commonwealth that offered the certificates in evidence and plainly worked at getting them admitted in the face of some confusion over which certificate related to which of the several quantities of drugs sent to the laboratory for analysis. As for the fourth factor, as noted above, the certificates were not mentioned in closing argument, undoubtedly because they had nothing to do with any actively contested issue in the case.

distributed on July 7, and October 18, 2005, as admitted by the defendant during those transactions and corroborated by their circumstances as well as the testimony of Rebollo, was overwhelming. The impact of the certificates on the fact finder, if any at all, was cumulative of that overwhelming evidence.

The court concludes, however, *ante* at 362, quoting *Commonwealth* v. *Tyree*, 455 Mass. 676, 704 n.44 (2010), that this very powerful circumstantial evidence did not "nullify any effect" that the certificates might have had on the fact finder, because, essentially, the certificates had the effect of proving that the drugs were cocaine rather than some other substance. Of course, the Commonwealth has the burden of proving the substance was cocaine, as it has done in this case with ample circumstantial evidence, but the Commonwealth does not have the burden to disprove every hypothesis that might be advanced in favor of the defendant's innocence. See, e.g., *Commonwealth* v. *Farley*, 443 Mass. 740, 745-746 (2005) ("The Commonwealth carries the burden to prove each and every element of the crime beyond a reasonable doubt. That burden does not include proof beyond a reasonable doubt that every theory of the case argued by the defendant could not be true"). At trial, there was neither a suggestion nor a theory that the substance might be counterfeit, that is, something other than the cocaine it was represented and appeared to be. Consequently, it is complete speculation that the certificates might have had any effect on the fact finder's consideration of what was plainly a nonissue in the case.[7]

As concerns the certificate admitted with respect to the cocaine found in the defendant's apartment on October 20, I am of a different view. While the circumstantial evidence, apart from the certificate, may have been sufficient to support a conviction, that is not the test we apply. The defendant never admitted or otherwise represented to the officers that the substance found on that date was cocaine, and there was no testimony from Rebollo regarding

---

[7]In our harmless error analysis, this court considers whether the error related to a live or contested issue at trial. See, e.g., *Commonwealth* v. *Pena*, 455 Mass. 1, 15 (2009) (admission of testimony related to decedent's cause of death harmless beyond reasonable doubt because it was not contested issue at trial); *Commonwealth* v. *Medina*, 430 Mass. 800, 811 (2000) (erroneous malice instruction harmless where defense "focused instead on issues of identity and causation"); *Commonwealth* v. *Doherty*, 411 Mass. 95, 102 (1991) (at defendant's trial, intent of principals not in dispute but only whether defendant had acted as coventurer with one or both principals).

that substance at all. In the absence of such evidence, I cannot conclude that the certificate had no effect on the verdict, and would reverse.

In sum, to the extent that the court's opinion can be read to suggest that, absent a stipulation or, perhaps, evidence of field testing, see *Commonwealth* v. *Connolly*, 454 Mass. 808, 830-832 (2009), the admission of drug analysis certificates can never be harmless beyond a reasonable doubt, I strongly disagree. The case before us presents a concrete example of when, in the context of a drug case as tried, the erroneous admission of certificates was harmless beyond a reasonable doubt.[8]

SPINA, J. (dissenting in part and concurring in part). The court has determined that the defendant should not be held to a lesser standard of review because of a failure to object to the admission of the certificates of drug analysis (drug certificates), where the circumstances relegated the act of objecting to an exercise in futility, and for reasons of fundamental fairness. I do not agree.

I agree that the trial judge was required to apply the law as stated in *Commonwealth* v. *Verde*, 444 Mass. 279 (2005). *Ante* at 356-357. However, that is not determinative of the question presented here. There is nothing unusual about requiring a litigant to preserve an issue in the trial court involving precedent that he seeks to have overruled in this court. In *Stonehill College* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass. 549, 562, cert. denied sub nom. *Wilfert Bros. Realty Co.* v. *Massachusetts Comm'n Against Discrimination*, 543 U.S. 979 (2004), we ordered the respondents' claims of trial by jury struck after overruling the decision in *Lavelle* v. *Massachusetts Comm'n Against Discrimination*, 426 Mass. 332, 338 (1997), to the extent it afforded the respondent a jury trial after the Massachusetts

---

[8]Since *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009), other intermediate appellate courts have reached similar conclusions. See *Koenig* v. *State*, 916 N.E.2d 200 (Ind. Ct. App. 2009) (in drug dealing prosecution, admission of laboratory report disclosing illegal drug in victim's blood harmless, where defendant admitted having given drug to victim, and that he took drug himself); *State* v. *Willis*, 230 Or. App. 215 (2009) (admission of drug certificates harmless beyond reasonable doubt where State's evidence included experienced arresting officer's testimony that, although not absolutely certain, he recognized seized substance as methamphetamine; substance was hidden in defendant's bra; and defendant admitted substance was contraband).

Commission Against Discrimination (commission) had taken final action on a complaint pending before it. We also declined, in the *Stonehill College* case, *supra* at 570, to overrule *Bournewood Hosp., Inc.* v. *Massachusetts Comm'n Against Discrimination*, 371 Mass. 303 (1976), and *Buckley Nursing Home, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 20 Mass. App. Ct. 172 (1985), cases approving emotional distress damages awarded by the commission for retaliation, as well as other employment discrimination claims under G. L. c. 151B, respectively. In *Dziokonski* v. *Babineau*, 375 Mass. 555, 556 (1978), we reversed the dismissal pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), of a complaint by parents seeking emotional distress damages against the defendant for negligently causing the death of their child, and we overruled *Spade* v. *Lynn & Boston R.R.*, 168 Mass. 285, 290 (1897), a case requiring proof of "impact" to a plaintiff before emotional distress damages could be recovered. In *Commonwealth* v. *Cepulonis*, 374 Mass. 487, 497 (1978), we affirmed the denial of the defendant's pretrial motion to dismiss indictments relating to a bank robbery for which he had been convicted in Federal court, and we declined to overrule *Commonwealth* v. *Gallarelli*, 372 Mass. 573, 577-578 (1977) ("same evidence test," which permits conviction under two statutes based on evidence of single act, does not offend prohibition against double jeopardy where each statute requires proof of additional fact which other does not), in favor of a "same transaction rule." In each of these cases the party seeking to overturn precedent preserved the issue in the trial court for appellate review. Lawyers are well aware that, although judges may be constrained to decide an issue under existing law that the lawyer seeks to have overruled on appeal, they must preserve the issue for appellate review by objection, motion, or otherwise.

Although obligated to apply existing law, judges commonly facilitate the efforts of counsel who seek to change case law. Judges often afford counsel an opportunity to prepare a thorough record in order to have an optimal basis to present the issue, and they frequently report a question on a record made suitable for an appellate court to consider whether existing precedent remains viable. See, e.g., *Stonehill College* v. *Massachusetts Comm'n Against Discrimination*, *supra* at 551.

This is not a case involving a claim of ineffective assistance

of counsel, based on a failure to object, where we have said that an objection would have been "futile" because a judge had broad discretion to admit evidence and probably would have done so even if counsel had objected. See *Commonwealth* v. *Carroll*, 439 Mass. 547, 557 (2003); *Commonwealth* v. *Cohen*, 412 Mass. 375, 392 (1992). Here, a simple objection was necessary, conformably with standard appellate practice, to preserve an issue for review. The Appeals Court noted in its decision in *Commonwealth* v. *Vasquez*, 75 Mass. App. Ct. 446, 459 n.9 (2009), that of sixty-two cases pending on appeal where trial occurred after *Commonwealth* v. *Verde, supra,* and before the United States Supreme Court granted certiorari on March 17, 2008 (552 U.S. 1256 [2008]), in *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009) (*Melendez-Diaz*), defense counsel had objected to the admission of ballistics or drug analysis certificates in thirty-one cases. There is nothing burdensome about an objection. It is a well-recognized, easy, and painless requirement to continue litigating an issue. There is nothing unfair about such a requirement in this case.

Any unfairness in this case fell on the shoulders of the Commonwealth. The court cites *Commonwealth* v. *Torres*, 420 Mass. 479, 482-483 (1995), and quotes *Commonwealth* v. *McDuffee*, 379 Mass. 353, 359 (1979), to explain that the "rationale behind the requirement of a specific [objection] is to enable the judge to make any necessary correction." *Ante* at 358. Those cases involved jury instructions. The instant case does not involve failure to object to a jury instruction, but rather failure to object to the admission of evidence. Where the failure to object relates to the admission of evidence, the principle on which the court relies is somewhat broader. "A party challenging the admission of evidence must timely object and state the specific grounds for his objection. Fed. R. Evid. 103 (a) (1).[1] This rule serves to ensure that 'the nature of the error [is] called to the attention of the judge, so as to alert him to the proper course of action *and enable opposing counsel to take corrective measures.*' Advisory Committee's Note to Rule 103 (a), 56 F.R.D. 183, 195 (1972)." (Emphasis added.) *United States* v. *Gomez-Norena*, 908 F.2d 497, 500 (9th Cir.), cert. denied, 498 U.S. 947 (1990). See 2 B.E. Bergman & N. Hollander, Wharton's Criminal Evidence

---

[1]Cf. Mass. G. Evid. § 103 (a) (1) (2010).

§ 8:31 (15th ed. 1998); 1 McCormick, Evidence § 52 (6th ed. 1987). See also *Tamerlane Corp.* v. *Warwick Ins. Co.*, 412 Mass. 486, 489 n.5 (1992); *Royal Indem. Co.* v. *Blakely*, 372 Mass. 86, 88 (1977); *Yuma* v. *Evans*, 85 Ariz. 229, 236 (1959); *State* v. *Buckner*, 214 N.W.2d 164, 167-168 (Iowa 1974); *Refrigeration Indus., Inc.* v. *Nemmers*, 880 S.W.2d 912, 919 (Mo. Ct. App. 1994). Because there was no objection, the Commonwealth was afforded no opportunity to rectify the matter by calling as a witness the chemist who analyzed the drugs.

*Crawford* v. *Washington*, 541 U.S. 36 (2004), created a sea change in the use of hearsay evidence in the prosecution of criminal cases across the country. Many State court cases have been appealed since the *Crawford* decision, involving many aspects of hearsay evidence. More will be appealed. At the time of trial in the present case, the admissibility of drug certificates was a likely issue that the Supreme Court would consider. There was every reason to believe that the issue we decided in *Commonwealth* v. *Verde*, *supra*, would eventually be taken up by the Supreme Court, if not in a review of the *Verde* decision itself, then in a different Massachusetts case (as occurred in *Melendez-Diaz*), or in a case from another jurisdiction. As the Appeals Court noted, "[a] virtual drumbeat of constitutional challenges is cataloged in the *Melendez-Diaz* petitions for certiorari. . . . [C]hallenges were mounting, and any evidentiary protocol allowing the admission of a drug certificate in lieu of testimony was under siege." *Commonwealth* v. *Vasquez*, *supra* at 460. If counsel wanted to preserve the issue of the admissibility of drug certificates, it should have been obvious that an objection would be necessary. That did not occur here. I would not conclude that an objection was futile or that its necessity was unfair, and, for the reasons I have given, I respectfully dissent.

I agree with the court's analysis that, under the harmless beyond a reasonable doubt standard of review, the defendant is entitled to a new trial.